No. 25-_____

# In the United States Court of Appeals
# for the Fifth Circuit

U.S. COURT OF APPEALS
RECEIVED
Sep 12, 2025
FIFTH CIRCUIT

SOUTHWEST AIRLINES CO.,

*Petitioner,*

*v.*

TRANSPORTATION SECURITY ADMINISTRATION,

*Respondent.*

## PETITION FOR REVIEW

Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
(512) 693-8350

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC 20006
(202) 626-5800

Kyle D. Hawkins
  *Counsel of Record*
William T. Thompson
Todd L. Disher
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lkcfirm.com

*Counsel for Petitioner*

Pursuant to 49 U.S.C. § 46110(a), Federal Rule of Appellate Procedure 15(a), and Rule 15.1 of the Circuit Rules of the Fifth Circuit, Petitioner Southwest Airlines Co. ("Southwest") hereby petitions this Court for review of Respondent Transportation Security Administration's ("TSA") decision upholding the imposition of liability on Southwest for September 11th Security Fees under 49 U.S.C. § 44940 in instances where no passenger traveled on a plane. This decision came in the form of a July 16, 2025 letter to Southwest's counsel from Holly C. Mehringer, Assistant Administrator and Chief Financial Officer of the TSA, which is attached hereto as Exhibit 1.

September 12, 2025                    Respectfully submitted.

Jonathan F. Cohn                      */s/ Kyle D. Hawkins*
LEHOTSKY KELLER COHN LLP              Kyle D. Hawkins
200 Massachusetts Ave. NW              *Counsel of Record*
Suite 700                             William T. Thompson
Washington, DC 20001                  Todd L. Disher
(512) 693-8350                        LEHOTSKY KELLER COHN LLP
                                      408 W. 11th Street, 5th Floor
Adam P. Feinberg                      Austin, TX 78701
MILLER & CHEVALIER CHARTERED          (512) 693-8350
900 Sixteenth St. NW                  kyle@lkcfirm.com
Washington, DC 20006
(202) 626-5800

*Counsel for Petitioner Southwest Airlines Co.*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System. Pursuant to 49 U.S.C. § 46110(b) and FRAP 15(c), the Clerk of the Court will serve the Petition for Review on Respondent Transportation Security Administration. In addition, Petitioner will send a copy of the Petition for Review to:

Michael A. Falcone, Acting Chief Counsel
U.S. Transportation Security Administration
6595 Springfield Center Drive
Springfield, VA  22150


  /s/ *Kyle D. Hawkins*
  Kyle D. Hawkins

# EXHIBIT 1



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

July 16, 2025

**TRANSMITTED VIA EMAIL AND MAIL WITH DELIVERY CONFIRMATION**

Adam Feinberg
Miller & Chevalier Chartered
900 16th Street NW
Black Lives Matter Plaza
Washington, DC 20006
Email: AFeinberg@milchev.com

Dear Mr. Feinberg:

I write in response to your letter of March 25, 2025, to the Transportation Security Administration (TSA) on behalf of Southwest Airlines (Southwest). In your letter ("Southwest Letter"), Southwest requested administrative review of TSA's determination, following an audit of air transportation sold between October 1, 2020 through August 31, 2023, that Southwest failed to remit to TSA $22,325,090.55 in September 11th Security Fee ("Fee") amounts that it collected from passengers. This letter is TSA's response.

After the audit process was complete and TSA sent a notification of liability to Southwest, Southwest asserted that it was not obliged to remit the Fee amounts in dispute because they were collected from passengers who never travelled. Southwest explains that the Fees in question were collected from passengers who purchased non-refundable air transportation and later received what Southwest refers to as a Residual Travel Fund (RTF) when they canceled their travel itinerary, and those RTFs expired unused. Per Southwest's definition, an RTF is comprised of *all* money collected from the passenger and is "not denominated as airfare, tax[es], Fee[s], or anything else. Instead, they represent unitary assets belonging to the customer." Southwest Letter, Ex. 5, ¶ 8. The only issue presented for this review is whether Southwest may retain as revenue Fees it collected from passengers who did not fly and who did not use the RTF that Southwest created for them (representing all sums collected for that unused ticket), upon the expiration of those RTFs; the audit put the amount of Fees unremitted on this basis at $22,325,090.55, which became the amount in the notice of liability that Southwest objected to via its letter of March 25, 2025. *Id.* at 1, 6-7.

As Southwest was made aware during the audit process (and consistent with the Fee statute, its implementing regulations, and TSA's prior guidance to industry), air carriers may not retain Fee amounts they collect even if the passenger does not ultimately fly. The Fee statute (49 U.S.C. § 44940) and its implementing regulations (49 C.F.R. part 1510) make clear that carriers are allowed to only possess collected Fee amounts temporarily and that

these collections must be remitted to TSA (if not refunded to the passenger), regardless of whether the air transportation is used. *Id*. at 2, 7-11.

Southwest's contrary interpretation of the statutory and regulatory language is artificial, as it emphasizes one consideration (i.e., whether the passenger has actually traveled) over unambiguous and consistent textual indications that air carriers must collect all Fees based on air transportation *when it is purchased* – and then must ultimately remit those collected Fees to TSA. Southwest's creation of an expiring RTF is not a refund of the Fee to the passenger. Southwest's proffer further acknowledges that rather than refunding the Fee amounts to passengers in this situation, when issuing RTFs, it combines the Fee amounts it collects from them with all other sums collected at the time the ticket is sold, despite a regulatory requirement that air carriers must separately account for Fee amounts at all times. TSA has issued guidance to air carriers regarding situations where a carrier returns the Fee amount to the passenger,[1] which is consistent with both the statutory and regulatory text as well as TSA's position in this audit: an air carrier that has collected a Fee for canceled air transportation can return that Fee back to the passenger[2] and claim a credit with TSA for doing so, but only if the Fee was remitted to TSA; the air carrier may not retain that Fee. Ultimately, because Southwest chose to retain Fee amounts collected from non-traveling passengers by placing them in an expiring RTF (rather than returning those Fee amounts directly to the passenger), it cannot rely on its contract of carriage or other considerations to supersede the terms and structure of the Fee statute, TSA's implementing regulations, or TSA's guidance.

For these reasons and as set forth in more detail below, TSA upholds the liability imposed based on the final audit report covering October 1, 2020 through August 31, 2023. The accrual of time to delinquency will remain suspended until 30 days after the issuance of this letter.

*Procedural Background*

In 2024, CBP conducted an audit of Southwest Airlines on behalf of TSA as authorized under regulation 49 C.F.R. § 1510.19. That regulation provides for authorized representatives to evaluate Southwest's imposition and collection of the Fee. The audit process includes testing to evaluate the accuracy and reliability of Fees imposed, collected, recorded, refunded, remitted, and reported between October 1, 2020 and August 31, 2023. Importantly, the audit is intended "to determine if any under/over imposition or under/over collection errors existed" during the audit period. The audit provides the air carrier opportunity to provide clarifying information as well as to comment on the proposed findings before they are finalized; Southwest offered comments during the audit process that were addressed by an "Auditor's Rejoinder" in the final audit report, dated September 10, 2024.

---

[1] That guidance indicates that where a carrier returns the Fee amounts it collected for a canceled ticket, it may offset that amount from the remittances otherwise due to TSA. TSA-2001-11120-0059, at 2-3 (guidance letter to industry dated Nov. 21, 2002).

[2] *See* TSA-2001-11120-0059, at 2 (noting that when a ticket "expires or loses *its* value*,* the [Fee] involved is subject to a refund by the collecting carrier *to the ticket purchaser*" (emphasis added)).

The audit process included an examination of how Southwest was handling the Fee when a passenger canceled his or her purchased itinerary. This part of the audit divided the overall audit period in question into two sampling frames in order to account for the fact that Southwest discontinued expiration of RTFs in July 2022. As a result, Sample Frame 1 covered October 1, 2020 through July 31, 2022, and Sample Frame 2 covered August 1, 2022 through August 31, 2023.

Sample Frame 1 of the audit examined 500 tickets,[3] of which 43 were for itineraries that were canceled,[4] after which Southwest issued a RTF, and those RTFs later expired unused, without the Fees initially collected being otherwise returned to the passenger or remitted to TSA. Instead, Southwest retained the Fees associated with the expiring RTFs. Extrapolated against Southwest's total ticket sales during this period, the audit concluded that Southwest had under-remitted the Fee amount of $25,228,375.80 during the Sample Frame 1 period. The examination also identified one instance (from the subset of 231 canceled tickets that were refunded in the original form of payment) for which Southwest refunded the Fee (of $5.60) to the passenger but then also remitted a Fee of $5.60 to TSA for that ticket. This resulted in an extrapolated over-remittance error of $376,493.08 due to Southwest. Further, Sample Frame 1 also identified 27 instances in which a total of $207.20 in Fees were transferred to RTFs that do not expire. While the auditors and TSA consider Southwest's handling of the Fee in these 27 instances to be an error (as a RTF is not a refund), because the non-expiring RTFs can be used at any time for the intended purpose of those underling amounts (including any Fee amounts subsumed within the RTF), the auditors did not monetarily quantify these errors.

In Sample Frame 2, the audit examined 100 tickets that were identified by Southwest as refunds, of which 48 were later converted to RTFs that no longer expired, nine of which remained unused.[5] Since non-expiring RTFs are available for the passenger to apply for their own benefit towards future travel with Southwest, the auditors, while identifying Southwest's handling of these nine unused RTFs as errors in refunding, they did not monetarily quantify these errors. The examination also revealed two tickets out of 52 in which Southwest had returned the Fees collected to passengers in the original form of payment for which Southwest

---

[3] Of that set of 500 tickets, 269 tickets were later converted to RTFs. Of that subgroup, 186 RTFs were used before expiration, and 13 others were refunded to the passenger's original form of payment through a refund claim, leaving the 43 RTFs that expired without distribution of the associated Fee to the passenger. Sample Frame 1 also identified 27 RTFs errors, consisting of $207.20 in Fees, that were transferred to RTFs that do not expire. Since non-expiring RTFs are still available for the passenger to apply for their own benefit towards future travel, the auditors – while identifying these transactions as errors in handling the Fee (as the audit did not reveal either a distribution back to the passenger or a remittance to TSA) – did not monetarily quantify these errors, as a future disposition of the Fee in connection with future travel could still ultimately be remitted to TSA (i.e., if the individual opted to purchase travel).

[4] Southwest collected $375.20 in Fees for these tickets.

[5] Of these 48 tickets that were converted to RTFs during Sample Frame 2, 35 RTFs were later used by the customer towards a new travel itinerary, four RTFs were refunded back to the passenger's original form of payment through a refund claim. The remaining nine RTFs are still available for future use.

had also remitted the Fee amounts in question to TSA ($11.20 in total).  This resulted in an extrapolated over-remittance error of $2,526,792.17 in favor of Southwest.

Collectively, these under-remittance and over-remittance errors were extrapolated over the respective sampling frames and netted against each other, resulting in a net under-remittance liability of $22,325,090.55 due to TSA.

On February 24, 2025, TSA notified Southwest that it had accepted the final audit report and was imposing a Fee liability in the amount of $22,325,090.55.  In that notification letter, TSA advised Southwest it could seek an administrative review of this liability determination.[6]  On March 25, 2025, Southwest submitted a request for administrative review that raised a single issue regarding the audit's findings: whether Southwest improperly failed to remit to TSA Fee amounts that it collected when selling non-refundable air transportation to a passenger who later canceled their travel, where Southwest incorporated the Fee into an expiring credit, that credit later expired, and the proceeds of the initial sale became revenue for Southwest.  Southwest Letter at 2.

*Factual Background*

Southwest's request for administrative review is based on the following circumstances.  When a passenger purchases non-refundable air transportation from Southwest and later cancels that air transportation, Southwest issues an expiring RTF for all amounts it collected from the passenger; under Southwest's internal accounting practices, "these credits are not denominated as airfare, tax[es], Fee[s], or anything else.  Instead, they represent unitary assets belonging to the customer."  Southwest Letter at 3 & Ex. 5, ¶ 8. When issuing the expiring RTF, Southwest first 'recalls' any prior remittance of the Fee in question as an accounting measure, such that Southwest has effectively remitted to TSA "no Fees when a ticket is cancelled in exchange for an RTF," including if "the RTF later expires as unused."  Southwest Letter at 3-4.  In that latter circumstance, "Southwest recognizes the *entire* amount [of the expiring RTF] as revenue," *id.* at 4 (emphasis added), even though the Fee portion of the RTF exists only because Southwest was under a statutory obligation to collect it from the passenger for TSA's benefit.

The applicable statutory and regulatory provisions governing an air carrier's responsibilities regarding the Fee are found in 49 U.S.C. § 44940 and 49 C.F.R. part 1510. Section 44940 imposes a Fee "on passengers of air carriers and foreign air carriers in air

---

[6] Specifically, the notification letter stated:

> You may make a written request for a review of TSA's determination of this compliance review. This includes any matter that may impact this debt determination, imposition, collection, refunding, remitting, and refunding of the fee during this audit period. The request must also state the basis for the dispute, including all factual information, documentation, citation to authority, argument, fees remitted in error or any other matters that may directly impact the findings, within 30 days of this notification. TSA will deny any requests raised after this timeframe as untimely.

transportation and intrastate air transportation originating at airports in the United States" to help defray costs associated with aviation security, including not only the screening workforce and its equipment, but related security measures as well, such as the Federal Air Marshal program, security-related capital improvements at airports, and training offered to pilots and flight attendants. *Id*., 44940(a)(1)(A)-(I). Notably, the statute does not require that a particular individual directly benefit in a quantifiable way from these measures; the statute requires only a that the Fee is "reasonably related" to the cost of these services to TSA. *Id.*, 44940(b). Likewise, the air carriers themselves benefit from having these security measures in place and are indirect beneficiaries of the Fee. A Fee is imposed when air transportation is sold and must be collected by the selling air carrier on TSA's behalf. *Id.*, 44940(d)(2), (3). That same section further mandates that:

- "[a]ll [Fees] imposed and amounts collected under this section are payable to the" TSA Administrator;

- the carrier is responsible for collecting the Fee when air transportation is sold; and

- the carrier must remit collected Fees and the end of the calendar month after the month in which the Fee was collected.

*Id*., 44940(e)(1), (2), (3). Finally, while the air carrier may not use collected Fee amounts to offset "the costs of collecting, handling, or remitting the fee," it may retain "interest accruing to the carrier after collection and before remittance." *Id.* 44940(e)(6).

TSA has issued regulations and guidance to air carriers that are consistent with these provisions. In 2002, TSA responded to the request from the Air Transportation Association (ATA) for clarity regarding "the refundability of the [Fee] to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel," as well as "whether carriers or TSA should provide refunds of [the Fee] to ticket purchasers, as it is common for carriers to have already remitted to TSA the actual fees collected." TSA-2001-11120-0059 at 1. In response, TSA reiterated that when air carriers collect Fees they must "hold them in trust for TSA and remit them to TSA by the end of the month following the calendar month in which transportation was sold. These air carriers are responsible for the safekeeping *and accounting* of these fees." *Id*. (emphasis added). Regarding ATA's inquiry about refunds, the guidance notes air carriers "are responsible for refunding [the Fees] to ticket purchasers," *id.*, and that 49 C.F.R. § 1510.9(b) requires that "[a]ny changes by the passenger to the itinerary" that alter the amount of Fees owed, whether more or less, "are subject to additional collection *or refund of [the Fee]* by the" air carrier that is responsible for collecting and remitting that Fee. *Id.* (emphasis added). Thus, the guidance offers that "[w]hen a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the [Fee] involved is subject to a refund by the collecting carrier to the ticket purchaser." *Id.* (emphasis added). Indeed, the collecting air carrier "must" stand ready to "provide the request[ing passenger] with a full refund of the fee" on demand in the event a ticket "expires or loses its value." *Id.*, at 1. That guidance closed with the reminder that "[i]n any case where an air carrier does not refund [the

Fees] to the ticket purchaser, *the fees must be remitted to or remain with TSA*," *id.* (emphasis added).[7]

Consistent with this 2002 Guidance, in March 2020, TSA-2001-11120-0680, TSA issued additional guidance to air carriers specifically related to refunds "to provide uniform clarification to industry during this unparalleled event [COVID-19 shutdown]." The March 2020 guidance echoed the language from the original guidance discussed above. The March 2020 guidance explains that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund…***If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA.***" (emphasis in original).

In light of the foregoing and as demonstrated more fully below, Southwest's contentions in support of its request for administrative review fails to account for the clear statutory and regulatory text as well as the guidance from TSA. All of these sources directly address the issue Southwest raises and leave no doubt that when Southwest collected Fees from passengers and later deposited those Fee amounts into undifferentiated RTFs that ultimately expired, the Fee amount portion of those undifferentiated RFTs still needed to be remitted to TSA, as those sums were not returned directly to the passengers in question. Each of Southwest's arguments to the contrary are addressed below.

*1) Southwest May Not Retain Fee Amounts That It Collects From Passengers*

As a foundational matter, Southwest does not broadly contend that an air carrier is entitled to retain as its own revenue any Fee that it collected only by virtue of 49 U.S.C. § 44940. This is so because by regulation, any Fee amounts collected by an air carrier "are held in trust" by that carrier "for the beneficial interest of the United States," such that the air carriers may assert "neither legal nor equitable interest in the security service fees." 49 C.F.R. § 1510.11(b). Those same regulations also require air carriers to "account for security service fees separately," even if the funds from the collected Fees are commingled with other sources of revenue. 49 C.F.R. § 1510.11(c). Importantly, once collected from a passenger, an air carrier "must remit *all* security service fees imposed each calendar month to TSA," and is "prohibited from retaining *any* portion" of the Fee in order to offset any administrative costs associated with accounting for collected Fees. 49 C.F.R. § 1510.13(a), (c) (emphasis added). These regulatory terms are fully consistent with Congress's plain direction that "*[a]ll fees imposed and amounts collected* under this section are payable to the Administrator of the Transportation Security Administration." 49 U.S.C. § 44940(e)(1) (emphasis added).

Instead, Southwest attempts to sidestep these foundational precepts in three ways. Southwest asserts that: a) "[t]here is no authority for TSA to collect any amount unless there is a 'passenger' and unless that passenger has actually engaged in 'air transportation' by being 'carri[ed] by aircraft,'" Southwest Letter at 7; b) TSA's fee regulations, 2002 and 2020

---

[7] If the air carrier does make a refund, the carrier may reduce its overall remittance to TSA for that month by the amount of the refund, provided that the air carrier keeps auditable records of the refund. *Id.*

guidance letters are inconsistent with 49 U.S.C. § 44940, *id.* at 8-9;[8] and c) TSA's reliance on 49 C.F.R. § 1510.11(b) (requiring that carriers hold the Fee in trust until it is remitted) is misplaced. *See id.* at 10-11.[9]  For the following reasons, none of these contentions is meritorious.

> *a)   The Law is Unambiguous That the Fee Exists When Air Transportation is Sold and Must Be Remitted to TSA (or Refunded) Irrespective of Actual Travel*

Southwest's recurring contention in its request for administrative review, that no Fee exists at all if a passenger does not ultimately fly, is entirely specious.  Southwest arrives at its faulty conclusion by selectively isolating just a few words in 49 U.S.C. § 44940(a)(1): that the Fee shall be imposed "on passengers . . . in air transportation."  Southwest goes on to selectively highlight the statutory definition of "intrastate air transportation," 49 U.S.C. § 40102(a)(27), as well as the regulatory definition of "air transportation" in 49 C.F.R. § 1510.3, both of which in Southwest's view incorporate the concept of "carriage by aircraft of persons for compensation or hire." *id.*[10]

Southwest's analysis and interpretation is highly artificial, however.  Read more fully, Section 44940(a)(1) imposes the Fee on passengers "*of air carriers* . . . in air transportation and intrastate air transportation," such that the phrase "in air transportation" describes the types of air carrier operations that are covered, rather than the passengers themselves.  *Id.* (emphasis added).  This understanding is reinforced by the statutory definition of "air transportation," which means "interstate air transportation, or the transportation of mail by aircraft," 49 U.S.C. § 40102(a)(5), and the definition of "interstate air transportation," which is "the transportation of passengers or property by aircraft *as a common carrier for compensation*," 49 U.S.C. § 40102(a)(25) (emphasis added).

Southwest's proposed reading of Section 44940(a)—as being applicable only when travel occurs—also cannot be squared with other provisions in Section 44940 that address when a Fee is collected and remitted.  That language demonstrates unambiguously that it is when air transportation is *sold* that "[a] fee imposed under subsection (a)(1) shall be collected

---

[8] In support of this contention, Southwest asserts "[s]econdly, and more importantly, even if 49 C.F.R. § 1510.9(b) were read (incorrectly) as suggested by TSA [in the 2002 and 2020 guidance], the regulation would be invalid because it would conflict with, and exceed the authority granted by, the Fee Statute which, as established above, authorizes TSA to receive funds only when a passenger flies."  Southwest Letter at 9.

[9] In connection with 49 C.F.R. § 1510.11(b), Southwest again asserts that "[o]n the law, § 1510.11(b) simply cannot override, or exceed the authority granted to TSA by, the Fee Statute," which "permits TSA to obtain funds only when the customer actually engages in air transportation."  Southwest Letter at 10.

[10] Southwest Letter at 2-3, 8-9, discussing the regulatory definition of "air transportation" provided by 49 U.S.C. § 1510.3, which covers "continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation."  Each of these subsidiary forms of "air transportation" have a definition that includes the phrase "the carriage by aircraft of persons for compensation or hire."  These definitions do not supersede the statutory definitions, however, nor do they demonstrate that a *passenger* must be transported before any collected Fee must be remitted to TSA.

by the air carrier," 49 U.S.C. § 44940(e)(2), and that, once collected, the Fee "*shall* be remitted to TSA," without limitation, 49 U.S.C. § 44940(e)(3) (emphasis added). These provisions require that an air carrier must collect and take on an obligation to remit a Fee to TSA without regard to whether travel occurs – and necessarily at a point before any air travel could occur.

Moreover, Southwest's proposed understanding of Section 44940(a) also cannot be squared with the practical realities of air transportation. Given the requirement in Section 44940(e)(3) that air carriers remit any Fees collected at the end of the calendar month after the month in which they were collected (a requirement that also does not depend on whether actual "air transportation" occurs), Southwest understandably does not argue or assert that it only collects the required Fee amounts from passengers at the moment when "air transportation" occurs or is about to occur.[11] Likewise, Southwest's emphasis on "air transportation" as a physical event cannot be squared with the fact that many passengers book air transportation far in advance, such that in many instances Southwest is both collecting *and* remitting the Fee before any actual travel occurs.[12]

Southwest's invocation of a discussion of the Fee statute in *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116 (D.C. Cir. 2009), Southwest Letter at 10, is unpersuasive. That case addressed a situation in which an airline sought a credit or refund of amounts it had remitted to TSA after making a change to a passenger's itinerary for its own reasons that potentially altered the Fees owed ("involuntary re-routes"), particularly where the air carrier remitted the Fee required without first collecting the same amount from the passenger. *See id.* at 1122-23. The air carrier in *Alaska* essentially contended that it should be entitled to retroactive application of a guidance document indicating that TSA would forego requiring remittances on involuntary re-routes as a prospective matter. Southwest's discussion, however, focuses on a description of TSA's refund policy as requiring an air carrier to refund a Fee when a passenger "never used the purchased ticket and thus did not *ultimately* incur a [F]ee liability," *id.* at 1122 (emphasis added).

Southwest's gloss on this discussion is misplaced for two reasons. First, this discussion in *Alaska* addresses only why it was reasonable for TSA to allow the *air carrier* to claim a refund for a Fee in one context (where a Fee was initially collected and later returned to the passenger) but not another (where a Fee was not collected, but was remitted by the air carrier from its own funds as it was obliged to do under 49 C.F.R. § 1510.9). That discussion in the court's decision did not undertake to answer the question of the outer limits of Section 44940, which Southwest posits here. Second, Southwest's gloss on the discussion in *Alaska* would mean that a Fee that was undisputably due *initially* (at the time of sale of the travel itinerary) later becomes unauthorized as a statutory and threshold matter due to a subsequent change in circumstances by the passenger. The better understanding, however, is that a Fee

---

[11] Nor does Southwest take the position that, for accounting purposes, it only segregates the Fee amounts that are required from the money collected from the passenger at the moment when actual air travel occurs.

[12] This conclusion is reinforced by Southwest's acknowledgement that when issuing an expiring RTF for canceled air transportation, it will "recall[]" any Fee already remitted to TSA, Southwest Letter Ex. 5 ¶ 7, which means Southwest is necessarily remitting collected Fee amounts before transportation occurs (as required by § 44940(e)).

properly due based on the itinerary at the time of sale becomes subject to Section 44940, TSA implementing regulations, and TSA's interpretive guidance, and remains so thereafter until the Fee is remitted to TSA – or, if the passenger does not fly, returned to the passenger.

Congress appears to have contemplated that there would not invariably be a direct correspondence between Fees collected, actual air transportation, and Fees remitted, as it allowed that TSA's Administrator "may" authorize refunds to air carriers for Fees "paid by mistake or any amount paid in excess of that required." 49 U.S.C. § 44940(g). This discretion necessarily permits TSA to impose appropriate requirements around how the Fee is to be refunded by airlines to passengers due to an intervening change to their itinerary. Furthermore, if an air carrier had remitted Fees to TSA that it collected from passengers who ultimately never flew, under Southwest's reading, the air carrier in question would not be entitled to a refund as no "Fee" (in Southwest's narrow understanding) existed. TSA has not exercised its authority over the Fee in consistent with the narrow view Southwest espouses here, and Southwest makes no proffer that it or its fellow air carriers would endorse the corollary understanding (that they would not be entitled to the refund of a remitted Fee for travel that ultimately never occurred) being extended to TSA's refund discretion under 49 U.S.C. § 44940(g).

In light of the foregoing considerations, the contention that "[o]nce the customer's ticket is canceled and the customer no longer has any right to engage in air transportation, there cannot be any 'Fee,'" Southwest Request at 10, is untenable.

> b) *TSA's Regulations and 2002 and 2020 Guidance Regarding Refunds Comport With Section 44940*

Southwest also contends that TSA's regulatory requirement in 49 C.F.R. § 1510.9(b) that air carriers make "additional collection or refund of the [Fee]" when a passenger changes his or her itinerary has no bearing on this issue, and that the 2002 guidance regarding what air carriers should do when a Fee has been collected for a non-refundable ticket is flawed because the guidance relies on this regulatory provision. Both of these contentions are meritless.

Beginning with Section 1510.9(b) itself, its unambiguous language is instructive in several respects. The Section requires that the Fee "must be based on the air travel *itinerary* at the time the air transportation is *sold*. Any changes by the passenger to the itinerary are subject to additional collection or *refund of the security service fee by the direct air carrier* or foreign air carrier, as appropriate." *Id.* (emphasis added). This language reinforces that an air carrier's obligation to collect and remit collected Fees is not predicated on actual travel but prospective air transportation, as its focus is on the passenger's "itinerary at the time the air transportation is sold" and any subsequent changes to it, rather than any other factor. Second, this language demonstrates that the air carrier's obligation to collect and remit the Fee to TSA when an itinerary changes —or make a refund of any collected Fee to the passenger— depends on further details regarding the change "as appropriate"; this may include, for example, a passenger's decision to change flight times, opt for a different destination, or choose not to fly at all. In any of these circumstances, the air carrier must either remit the collected Fee to TSA (potentially increased or reduced by itinerary changes) or return those

amounts collected to the passenger; in no circumstance can the air carrier end up keeping the Fee as its own revenue.

Southwest's related contention that the 2002 and 2020 guidance are flawed because they are wholly dependent on Section 1510.9(b) rests again on an artificial reading of those documents. That guidance states that an air carrier selling non-refundable air transportation may either refund the Fee collected or remit the Fee to TSA, but may not ultimately retain the Fee amounts collected. In reaching that conclusion, the guidance recites the requirements that air carriers collect, safeguard, and remit to TSA fees required by Section 44940, which are found in 49 C.F.R. § 1510.9(a), (c), 1510.11(b), and 1510.13(a). While Section 1510.9(b) is expressly cited and quoted, it is only the last and most salient portion of a larger recitation of an air carrier's responsibilities regarding the collection and remittance of the Fee. Collectively, and as established above, these requirements demonstrate that collected Fees cannot ultimately reside with the air carrier. These regulatory requirements comport fully with Section 44940, such that the bottom-line expectation in the 2002 guidance letter—that air carriers are to refund the Fee to the passenger "*when a ticket loses its value*" (as would be the case when a RTF expires), *see* TSA 2001-11120-0059, at 1 (emphasis added)—comports with Section 44940 as well. By extension, where an air carrier does not actually return to a passenger a Fee amount that it was only allowed to collect from that passenger by virtue of Section 44940, the carrier cannot merely convert that Fee to revenue. It must remit that un-refunded Fee to TSA.

To the extent Southwest asserts that TSA's interpretation is flawed because "Congress plainly knows how to craft a statute requiring a carrier to give the customer a refund," Southwest Letter at 10, this contention (invoking the Federal excise tax regime of 26 U.S.C. § 4261) is puzzling in two respects. First, this contention addresses a statutory provision regarding when an *air carrier* may be entitled to a refund of remitted excise tax amounts *from the government*, rather than defining when and how a passenger may request a refund from an air carrier. To the extent this provision illuminates what kind of transaction between airline and passenger qualifies as a "refund," the provision indicates that an air-carrier-to-passenger refund has occurred only when the air carrier "has *repaid* the amount" in question, 26 U.S.C. § 6415(a) (emphasis added) – which is materially different than offering an expiring RFT covering amounts that Southwest will be retaining at all times. Second, Southwest's overarching interpretation is further undercut by the Internal Revenue Service's Revenue Ruling 89-109, which was issued to clarify that "to the extent the airline does not refund to the passenger the amount paid for the air transportation, *the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government*." TSA-2001-11120-0057, at 2 (emphasis added). This position in the Revenue Ruling about refunds governed by Section 6415 is consistent with TSA's view that the Fee must either be returned to the passenger or remitted to TSA.[13] TSA's position regarding what an air carrier must do with a collected Fee when a credit for nonrefundable air transportation expires is thus fully consistent with the analogous situation arising in the context of Section 6415 as well as the proposed solution recommended by ATA.

---

[13] Indeed, this understanding is the same resolution that the ATA itself proposed when it wrote TSA to convey its members' uncertainty about what to do with Fees collected for non-refundable air transportation that later loses its value, in the very letter that prompted TSA to issue its 2002 guidance on this point.

*c)  Air Carriers May Not Assert an Equitable or Legal Interest in Fees Collected*

The review request also takes exception to TSA's reliance on Section 1510.11(b) as relevant to this issue.  That provision reinforces that Fees collected by a carrier "are held in trust" by the "carrier for the beneficial interest of the United States" and that the "carrier holds neither legal nor equitable interest in the" Fees (except for the right to keep the interest thereon).  *Id.*  Southwest contends that this provision is intended only to "shield[] those funds from the carrier's creditors in the event of bankruptcy" by disallowing an "*equitable* interest in them," and asserts that "the purpose of § 1510.11(b) is *not* to define what is a Fee and what is not."  Southwest Letter at 11 (emphasis added).  But Section 1510.11(b) has broader effect than Southwest contends as it prohibits an air carrier from asserting any equitable *or legal* interest in a collected Fee, and on the whole reinforces the understanding that air carriers cannot claim for themselves the Fees that they collect from passengers.

*2)  An Expiring Credit Like Southwest's RTF is not a Refund of a Collected Fee*

At its core, Southwest's argument hinges on whether its issuance of an expiring RTF to a passenger who cancels non-refundable air transportation constitutes a refund of the Fee to that passenger, such that Southwest is not ultimately claiming as revenue for itself amounts collected solely by operation of Section 44940.  Southwest contends that TSA fails to cite any authority that indicating that RTFs do not qualify as refunds, whereas it is aware of "a multitude of sources" that consider RTFs as refunds.  Southwest Letter at 12.[14]  As examples of this, Southwest points to its internal accounting practices, its contract of carriage with its customers, the shorthand label that customers and others outside Southwest use in referring to RFTs, and case law regarding the excise tax provisions discussed above.  *Id.* at 12-13.  At bottom and as set forth more fully below, however, Southwest's contention that an expiring RTF constitutes a refund amounts to a semantic game to generate a windfall for the air carrier, as it will have both availed itself of TSA's guidance about refunds (by "recalling" the Fee amounts associated with the expiring credit from the overall amount of Fees that the carrier must remit to TSA at the end of the month) while still withholding that same amount from the passenger.  In that circumstance, the air carrier has not provided a refund consistent with the statutory, regulatory, and guidance language described above.

Southwest's contention that creating an expiring credit in the form of RTF is a refund of the Fee cannot be squared with its regulatory obligations regarding the Fee.  As Southwest describes it, when issuing an expiring RTF, it first "recall[s]" any Fee amounts remitted to TSA for the canceled air transportation, and then places all sums collected from the passenger for that air transportation into an undifferentiated RTF, which effectively comingles the airfare with any taxes and fees (and thus the Fee amounts that Southwest collected from the

---

[14] Southwest's discussion on this point misrepresents TSA's position on RTFs that are used.  As indicated in its audit, non-expiring RTFs that contain the original Fee amount collected are still errors, but TSA has not sought to quantify the error for liability purposes.  Likewise, when a RTF *is* used, and the Fee originally imposed and collected is used for its proper purpose, the amount in question must be remitted to TSA.  In both of these circumstances, TSA is not taking a position on whether there was a refund, but only whether a Fee that was to be imposed and collected based on an itinerary has been properly remitted.

passenger when selling the ticket).  But the regulations make clear that "air carriers and foreign air carriers are responsible for the safekeeping of all security service fees *from the time of collection to remittance*."  49 C.F.R. § 1510.11(a) (emphasis added).  Further, carriers must hold collected fees "in trust…for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940."  *Id*. at § 1510.11(b).  And given the prohibition against a "direct air carrier or foreign air carrier hold[ing] . . . legal []or equitable interest in the security service fees" (except for the right to retain any accrued interest on the principal amounts collected)," *id.*  as well as their obligation to "account for [the Fees] separately" once they have been collected, *id.* at § 1510.11(c), Southwest is prohibited from merging or rebranding collected Fees with other funds when accounting for the Fee (even if it may temporarily keep the actual funds with other funds), and so may not eliminate the source or label of the Fee through the expediency of placing it in an undifferentiated (and expiring) RTF.  Indeed, Southwest is required to account for the total amount of Fees "imposed on passengers in U.S. currency," the net amount of Fees "collected in U.S. currency by the . . . air carrier," the total amount of Fees "*refunded in U.S. currency by the . . . air carrier*," and the total amount "remitted in U.S. currency by the . . . air carrier."  49 C.F.R. § 1510.17(b)(1)-(5) (emphasis added).

Southwest likewise cannot credibly contend that its terms of carriage supersede the provisions of the Fee statute or TSA's interpreting regulations of that statute (or, by extension, the comporting guidance that TSA issues regarding the Fee).  Moreover, even if Southwest could contend that the passenger forfeited his or her right to *demand* a refund of the Fee from Southwest by having assented to Southwest's contract of carriage, it does not follow from that consideration that Southwest is entitled to *retain* the Fee amounts.  Southwest Letter at 12.[15] The default position under the Fee statute is that the air carrier "shall" remit the Fees that it collects from passengers to TSA.  49 U.S.C. § 44940(e)(3).  While TSA has offered an accommodation for air carriers to offset any amounts that the air carrier has refunded to passengers from the total amount of Fees collected in any given month, Southwest's approach to expiring RTFs essentially creates a windfall for the airline, as it has both availed itself of that accommodation (by immediately "recalling" from TSA the Fee amounts associated with an RTF from the overall amount of Fees that it must remit) and then withheld that same amount from the passenger.

This expiring credit arrangement is not a refund of the Fee to the passenger in any material sense, as Southwest has not returned or repaid the Fee amount to the passenger, but rather devised an arrangement whereby it can lay claim to it (in contravention of 49 U.S.C. § 1510.11(b)) by offering only a temporary expiring credit towards future travel.  The examples described in the Southwest Letter where individuals may use the label of "refund" when referring to a RTF—whether during internal discussion at Southwest, when

---

[15] Southwest points to Section 4.c.3 of its Contract of Carriage, which states that "Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, except as provided in this Section and Section 9b." Southwest Letter at 12 (emphasis omitted).  Section 4.c.(3)(ii) allows only that "the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of future travel on Carrier for the originally ticketed Passenger only," and Section 4.c.(3)(iv) states that if not used within the "eligibility period," the passenger forfeits "the entire amount of the fare, including all taxes, security fees, and Passenger Facility Charges."

communicating with Southwest's customer service, when describing Southwest's ticketing policies in an article, or even in the course of informal correspondence during the audit at issue here[16]—reflect a colloquial convenience that sheds little light on why Southwest's contract of carriage should supersede the plain text of Section 44940 and TSA's implementing regulations.

Southwest's reliance on two particular court decisions as emblematic of "case law" regarding refunds[17] also does not warrant departure from this interpretation. The Southwest Letter points to *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997), in which the court upheld a jury's verdict that an air carrier was entitled to a refund of excise tax amounts that it had previously remitted to the government for tickets that were ultimately canceled. That ruling thus addressed a refund of sums that were actually transferred *by the carrier to the government*, under a different statutory regime, following a trial in which the government offered no case in opposition, and in which the appellate court applied the deferential standard of review applicable to jury verdicts, *id.* at 553.[18] As such, that ruling is of limited persuasive value in this context and does not demonstrate that labeling a transaction as a refund precludes the government from considering whether actual money was returned to the customer. Despite its efforts to complicate the issues here, the simple answer to Southwest's request is that it is not entitled, either on a legal or equitable basis, to retain as revenue Fee amounts that it collects from its passengers for an air transportation itinerary that required it to collect the Fee in the first place; that money belongs to the United States if it is not returned to the passenger. There is no statute, case, regulation, or guidance document that indicates otherwise.

Southwest's reliance on the unpublished decision in *Davis v. Central Alabama Electric Cooperative,* No. 15-0131, 2015 WL 5285894 (M.D. Ala. 2015), similarly misses the mark. Relying on discussion in a footnote, Southwest proffers that the *Davis* court crystalized a common understanding of the term refund. But the *Davis* court's analysis was based entirely on "in–depth scrutiny of the terms and features of Alabama Code § 37–6–20, the statute animating plaintiff's claims." 2015 WL 5285894, at *2. Based on the plain language of the Alabama statute, and the relevant by-laws of the entities involved, the court concluded that where the statute was silent on mechanism of the refund, a credit distribution by the electrical cooperative was sufficient to meet terms of the cooperative agreement's requirement to issue refunds of excess funds to the members of the cooperative. *Davis*, 2015 WL 5285894, at *5 ("Nothing in the plain language used in the statute would impose a specific requirement that all such distributions be made in cash.").

But to the extent that the *Davis* decision teaches anything about the "'the plain, ordinary meaning of a "refund,"'" Letter at 14 (quoting *Davis*, 2015 WL 5285894, at *5, n.7), Southwest's invocation of the court's discussion on that point glosses over the consideration

---

[16] *See* Southwest Letter at 14.

[17] Southwest Letter at 14.

[18] Moreover, United's unrebutted testimony showed that its accounting entries and netting transactions demonstrate that the full fare and excise tax were repaid to the customer.

that the RTFs it creates for a passenger canceling an itinerary are in no way a "distribution" of the Fee amount to the passenger, a term that the *Davis* court incorporated into its thinking, *id.* Rather, when creating a RTF, Southwest is indisputably retaining the Fee in its coffers, along with all other amounts paid by the passenger for the initial ticket, Letter at 3-4, until such time as the passenger purchases a new ticket or the RTF expires. To the extent the *Davis* court's discussion goes on to speculate that a refund may be made "via credit *to an account* rather than cash on the barrelhead," *id.* at 14 (quoting *Davis*, at *5, n.7), that court was not confronting the arrangement Southwest has created via its expiring RTFs – in which Southwest is establishing a temporary fund that Southwest fully controls for the limited benefit of an individual passenger (inasmuch as the funds cannot be used for anything other than travel with Southwest), rather than "to an account" that is controlled by the passenger and may be put to any use. TSA believes these to be material distinctions between Southwest's practice and the discussion in *Davis*.

Southwest's reliance on *Davis* is misplaced for a third reason because, unlike the Alabama statute that is silent on mechanism of distribution, TSA's Fee framework requires carriers to account for the total amount of Fees "imposed on passengers in U.S. currency," the net amount of Fees "collected in U.S. currency by the . . . air carrier," the total amount of Fees "*refunded in U.S. currency by the . . . air carrier*," and the total amount "remitted in U.S. currency by the . . . air carrier." 49 C.F.R. § 1510.17(b)(1)-(5) (emphasis added). As such, the finding in *Davis* provides no instruction because that court was forced to look beyond the language in the statute to articulate what was required to accomplish a distribution. Here, there is no need to look further than the relevant statutory framework at issue to understand what a refund to the passenger requires.

*Conclusion*

The positions underlying the audit's findings flow directly from and are consistent with both the text of Section 44940 and TSA's regulatory provisions implementing that statute in 49 C.F.R. part 1510. TSA's guidance in 2002, and again in 2020, is likewise clear that air carriers may not retain Fee amounts they collect from passengers under the auspices of Section 44940. As such, all air carriers, including Southwest, had clear understanding that liability could arise from its decision to place the Fee in an expiring RTF when a passenger chose to cancel non-refundable air transportation.[19] What becomes of the airfare, taxes, and other fees (aside from the Passenger Fee) that were collected from the passenger when the non-refundable air transportation was purchased may be governed by other considerations, but Section 44940 is unambiguous that air carriers "shall" collect a Fee based on the itinerary

---

[19] This is corroborated by the fact that air carriers with similar policies regarding non-refundable air transportation do not withhold from Fee amounts associated with canceled and unused travel credits. Southwest's contention that the TSA Guidance relating to Fee refunds is not binding, quoting the Department of Justice Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018), Southwest Letter, Ex.9, does not serve to negate the fact that industry was given ample instruction relating to this issue. Relatedly, Southwest includes reference to a previous audit's discussion of the RTF process and whether the RTF constitutes a refund. Southwest Letter Ex. 11. In that prior audit, the auditor concluded, based on TSA's communications on the subject, that the RTF was not a refund to the passenger that entitled Southwest to claim a credit for the Fee with TSA.

when selling air transportation and "shall" remit those collections to TSA.  49 U.S.C. § 44940(e)(2), (3).

For these reasons, TSA upholds the audit's finding that Southwest should have remitted to TSA $22,325,090.55 of Passenger Fee collections.

This letter constitutes our final agency decision.  Pursuant to 49 U.S.C. 46110, you have 60 days to seek review of this decision in an appropriate United States Court of Appeals. Because Southwest made a timely request for review of the liability set forth in the notification letter, no time has begun to accrue toward delinquency in TSA's view.  TSA will allow 30 days from the date of this letter before the liability in the notification letter is deemed delinquent, but not through final judgment in any judicial review process.

Sincerely,

Holly C. Mehringer

Assistant Administrator and Chief Financial Officer
Transportation Security Administration

Enclosures:

Southwest Letter dated March 25, 2025 (without attachments)
TSA 2002 Guidance Letter, TSA-2001-11120-0059
TSA 2020 Guidance Letter, TSA-2001-11120-0680
ATA Inquiry Letter, TSA-2001-11120-0057
TSA Audit Notification dated February 24, 2025
TSA Debt Collection Notice
TSA Invoice for Liability
TSA Remittance Instructions

TSA Invoice for Liability
TSA Debt Collection Notice
TSA Remittance Instructions

Optional Form 1114 (2-79)
Title 7, GAO MANUAL

# BILL FOR COLLECTION

Department, establishment, bureau or office receiving funds:

Department of Homeland Security
Transportation Security Administration
c/o U.S. Coast Guard Finance Center (OG)
1430A Kristina Way, Chesapeake, VA 23326

| | |
|---|---|
| Customer Account Number:  6049 - TSAAVD0181 | |
| Invoice Number | PFJUL25JUL25-D0181AU |
| Date of Invoice | 16-JUL-25 |
| Date Payment Due | 15-AUG-25 |

Bill to: SOUTHWEST AIRLINES
        ATTN: Susan Estrada
        Corporate Tax Department
        2702 Love Field Dr.
        HDQ-6TX
        Dallas, TX  75235
        Email: Susan.Estrada@wnco.com

| Order No. | Article or Services | Amount |
|---|---|---|
| | | (Dollars and Cents) |
| 1 | Passenger Civil Aviation Security Fee (September 11th Security Fee) | $22,325,090.55 |
| | Audit Scope Period: October 1, 2020-August 31, 2023 | |
| | This invoice is pursuant to Federal Regulation 49 CFR Part 1510 | |
| | which provides for the compliance audit to verify that the security | |
| | fees have been properly collected, refunded, and remitted. | |
| | Original Amount | $22,325,090.55 |
| | Amount Paid / Credited | $0.00 |
| | **Invoice Due Amount** | **$22,325,090.55** |

Agency Location Code:                        Project Number:

**Payment Instructions**

1. For the September 11th Security Fee, see enclosed remittance instructions and Debt Collection Notice.
2. Interest, administrative charges and penalties will be assessed on all payments not received by due date.
3. If you have questions regarding payment method, please contact:

TSA
tsa-fees@tsa.dhs.gov



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

## DEBT COLLECTION NOTICE

In addition to any civil enforcement actions TSA may take as described below, please be advised that if this debt is not paid in full within 30 days of the date of this letter, the debt will be also considered delinquent for debt collection purposes.

For delinquent debts, Federal law requires TSA to charge interest. The interest will be charged at the Treasury Current Value of Funds Rate, along with an administrative charge of $12.00 per month, representing the administrative costs of collection. Furthermore, if the amount assessed is not paid in full within 90 days of the date that the debt becomes delinquent, TSA is required to assess an additional collections-related penalty at an annual rate of 6%, accruing from the date of delinquency. In limited cases, TSA will consider written requests for the use of payment schedules, where justified by economic need and in the public             interest. For your convenience, payment instructions are enclosed.

     If TSA does not receive the full amount due and owing from the within 30 days of the date of this letter, TSA intends to enforce collection by taking one or more of the following actions:

     (1) Administrative Offset -- Should the debt not be paid in full within 30 days, TSA will withhold any funds payable to your company to satisfy the debt.

     (2) Treasury Department's Financial Management Service -- Debts that are delinquent for more than 60 days may be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation. Debts that are delinquent for more than 120 days will be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation.

     (3) Private Collection Agency -- TSA may forward the debt to a private collection agency.

     (4) Credit Bureau Reporting -- TSA may report the debt to commercial credit bureaus and consumer reporting agencies.

     (5) Litigation -- TSA may refer the debt to the Department of Justice to initiate litigation to collect the debt.

     (6) Federal loans or loan insurance or guaranties -- As required by 31 U.S.C. § 3720B and 31 C.F.R. § 901.6, the United States may decline to extend financial assistance in the form of a loan, loan guarantee, or loan insurance to any entity that is delinquent on a debt owed to a

Federal agency. The United States will not extend credit until after the delinquency has been resolved.

(7) Suspension or revocation of eligibility for licenses, permits, or privileges -- TSA may suspend or revoke licenses, permits or any other privileges for any inexcusable or willful failure of a debtor to pay a debt.

Please also be advised that in addition to pursuing debt collection action in the seven options above, TSA is authorized by 49 U.S.C. § 46301 and 49 C.F.R. § 1503.401 to impose a civil penalty against an air carrier for each day that the air carrier failed to remit a security service fee in accordance with 49 C.F.R. part 1510.  Pursuant to the Homeland Security Act of 2002, the maximum civil penalty is $37,377 per violation.  Each day that an air carrier fails to remit the required security service fee may constitute a separate violation.

Further, failure to remit the September 11th Security Fees may be considered an unfair and deceptive practice in violation of 49 U.S.C. § 41712, requiring referral to the U.S. Department of Transportation for enforcement action.  Finally, information concerning your company's failure to remit security service fees to TSA may be referred to the Department of Transportation's Air Carrier Fitness Division for appropriate consideration with respect to your company's fitness to hold a certificate of public convenience and necessity under 49 U.S.C. § 41102.

Additionally, you may address any correspondence by email at tsa-fees@tsa.dhs.gov or to:

U.S. Transportation Security Administration
Chief Finance Office, Revenue Division
6595 Springfield Center Drive, TSA-14
Springfield, VA 20598-6014

# Security Fees
# Payment Instructions

Tel: 571-227-2323 / TSA-Fees@tsa.dhs.gov

Air carriers subject to the September 11 Security Fee will not receive an invoice and must initiate monthly payments to TSA according to regulation 49 CFR1510. Please follow any of the payment options below.

## Option A: Pay.Gov

Submit your payment securely online through Pay.Gov . Use direct withdrawl from a U.S. bank account (ACH debit in USD only). There is no fee for this transaction.

**Step 1**   Visit Pay.Gov to pay online if you already have TSA approved access to the September 11th Security Form.*
**Step 2**   Select "My Forms, Private" select "continue" to access the form "September 11th Security Fee."
**Step 3**   Select payment method "ACH Direct Debit" and continue to the form. Ensure your banking institution authorizes direct debit.
**Step 4**   Enter  the carrier name, contact information, payment and select payment date.
            Leave the reference number field blank, unless provided in written communication from TSA.   Select "Submit Data."
**Step 5**   Enter the account holder name, account type, routing number, account number.  Select "Submit Data."
**Step 6**   Check the box for the authorization and disclosure statement to finalize and submit your payment.

Be sure to print a copy for your records. If processing another payment, return to the available forms or log out to exit. You will receive an email notification from Pay.Gov once the payment is processed.

## Option B: Wire Transfer

Submit your payment through a wire transfer in USD. To initiate a wire transfer, you must provide the sending bank with the following instructions:

1.   {1510} Type-Subtype : 1000
2.   {2000} Amount: *Provide the USD payment amount. All banking fees are the responsibility of the sender as stipulated in 49 CFR 1510 and are not to deducted from remittance to TSA.*
3.   {3400} Receiver ABA routing number: 021030004 *(This is the routing symbol for the U.S. Treasury at the Federal Reserve Bank in New York)*
4.   {3400} Receiver ABA short name: TREAS NYC
5.   {3600} Business Function Code: CTR *(or CTP)*
6.   {4200} Beneficiary Identifier (account number): 70111001 *(This is the TSA Agency Location Code (ALC). Ensure that the sending bank enters this eight-digit number as shown. If the information is not populated correctly, the Fedwire will be returned.)*
7.   {4200} Beneficiary Name: DHS/TSA
8.   {4200} Beneficiary Address: 6595 Springfield Center Drive, Springfield, VA 20598-6014
9.   {5000} Originator: *Enter the name of the originator of the payment.*
10.  {6000} Originator to Beneficiary Information: "September 11th Security Fee", "Month", "Year", "Amount", and "Carrier Name". *This information is required to ensure that the payment is properly credited to your account.*
*************************The financial institution address for the U.S.Treasury's routing number is 33 Liberty Street, New York, NY 10045*************************

## Option C: Check or Money Order

You may pay with a check drawn from a U.S. bank or money order for fees less than $1,000. Mail to:

Standard
**U.S. Department of Homeland Security**
**Transportation Security Administration**
**P.O. Box 979129**
**St. Louis, MO 63197-9000**

Overnight: Effective October 2023
**U.S. Bank Government Lockbox**
**3180 Rider Trail S.**
**Attn: Government Lockbox, LBX #979129**
**Earth City, MO 63045**

Please be sure to include the proper remittance advice including carrier name, fee month and year. Checks will be processed as an electronic funds transfer within 24 hours and will be shown in the account statement. TSA will keep a copy of the check and the original will be destroyed. TSA is authorized to process the copy in place of the orignal check if there are technical issues in processing. If the eletronic funds transfer cannot be completed due to insufficient funds, TSA may attempt the transfer up to two times. All banking fees are the responsibility of the air carrier.

* If you already have a Pay.Gov account, please email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Security Fee Form. If you do not have a Pay.Gov account, please visit Pay.Gov to enroll, then email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Form.



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

# Air Carrier Administrative Review Request Letter

Miller & Chevalier

**Adam P. Feinberg**
**Member**
**(202) 626-6087**
**afeinberg@milchev.com**

March 25, 2025

**Via Overnight Delivery and Via E-Mail (pamela.mcmenamin@tsa.dhs.gov and tsa-fees@tsa.dhs.gov)**

Pamela McMenamin, Compliance Manager
U.S. Transportation Security Administration
Chief Finance Office, Revenue Division
6595 Springfield Center Drive, TSA-14
Springfield, Virginia  20598-6014

> **Re:     Southwest Airlines Co.'s Request for Refund Pursuant to 49 U.S.C.**
> **§ 44940(g) and Request for Review of TSA's Claim of Liability Relating to**
> **September 11th Security Service Fees**

Dear Ms. McMenamin:

Pursuant to 49 U.S.C. § 44940(g), Southwest Airlines Co. ("Southwest") respectfully requests a refund of $2,903,285.25 that Southwest mistakenly paid to the Transportation Security Administration ("TSA") in excess of the amount of September 11th Security Service Fees ("Fees," or singularly, a "Fee") that Southwest was required to collect and remit.  In addition, pursuant to 49 C.F.R. § 89.21, Southwest Airlines Co. ("Southwest") respectfully requests review of the validity and amount of the $22,325,090.55 claim of liability made by TSA against Southwest in connection with Southwest's Fee collection and remittance.  A copy of that claim of liability, dated February 24, 2025, is attached as Exhibit 1 and is referred to herein as the "Claim."  A copy of the "Bill for Collection" accompanying the Claim is attached as Exhibit 2.

The Claim is based on a review or audit of Southwest's compliance with the September 11th Security Service Fee statute, 49 U.S.C. § 44940 (the "Fee Statute") and TSA's regulations thereunder, 49 C.F.R. §§ 1510.1-1510.21 (the "Fee Regulations").  That review or audit (the "Audit") covers the period October 1, 2020, through August 31, 2023 (the "Audit Period").  The Audit culminated in a written audit report dated September 10, 2024, that was enclosed with the Claim and is attached hereto as Exhibit 3 (the "Audit Report").

Southwest's refund request and request for review arise from the same issue.  The $22,325,090.55 purported liability in the Claim is net of $2,903,285.25 in overpayments identified by the government auditors in the Audit Report.  Before that offset, the gross amount that the auditors contend Southwest underpaid is $25,228,375.80.  *See, e.g.*, Audit Report at 3.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 2

That purported underpayment is based entirely on 43 supposed "error" tickets where the customer never flew, the ticket was cancelled, Southwest issued a "Residual Travel Fund" ("RTF") to the customer for the value of the unused flights, including airfare, taxes, and Fees, and the RTF later expired unused – all in accordance with the terms of Southwest's Contract of Carriage.  An RTF – which is sometimes also called a "travel credit" or "flight credit" – is an electronic account in the customer's name and constitutes an acceptable form of payment for future ticket purchases; an RTF is essentially a virtual credit card or a gift card that may be used to purchase future travel on Southwest.  *See* Declaration of Michelle Buckley ("Buckley Decl.") ¶ 7; Declaration of Tracy Feinstein ("Feinstein Decl.") ¶ 4.[1]  TSA asserts that, when a customer's ticket is cancelled in exchange for an RTF, Southwest was required either to refund the Fees to the customer or to remit them to TSA, but that Southwest did neither.  TSA takes the position that once an RTF expires unused, it does not qualify as a refund.

TSA's position is wrong for two independent reasons.  First, TSA has no authority to assess a Fee if the customer does not engage in air transportation – that is, if the customer is not a "passenger" of an "air carrier" in "air transportation."  49 U.S.C. § 44940(a)(1).  In each supposed "error" ticket at issue, the customer in question did not fly, *i.e.*, did not engage in air transportation.  Second, even if TSA were correct that a Fee is owed when the customer does not fly and the Fee is not refunded to the customer, no Fee was due for any of the 43 tickets at issue because Southwest provided the customer a refund in the form of an RTF.  For all of the 43 tickets in question, the refund was made at the time the RTF was issued, notwithstanding its eventual expiration pursuant to Southwest's Contract of Carriage.

## Statutory, Regulatory, and Factual Background

### A.    The Fee Statute and Fee Regulations

In response to the terrorist attacks on September 11, 2001, Congress enacted the Aviation and Transportation Security Act, which established the TSA and charged it with maintaining civil aviation security.  *See* 49 U.S.C. § 114.  To cover the costs of certain security services, TSA was required to "impose a uniform fee[] on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States."  49 U.S.C. § 44940(a)(1).

"Air transportation" is defined by statute as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft."  49 U.S.C. § 40102(a)(5).  In turn, "foreign air transportation" is defined as "the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between a place in the United States and a place outside the United States when any part of the transportation is

---

[1] The Buckley Declaration and Feinstein Declaration are attached hereto as Exhibits 4 and 5, respectively.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 3

by aircraft," while "interstate air transportation" is defined as "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mal by aircraft" between States. 49 U.S.C. § 40102(a)(23), (25). "[I]ntrastate air transportation" is defined as "transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." *Id.* § 40102(a)(27). All of these definitions explicitly require the "transportation" of a passenger (or property or mail) by aircraft. "Air transportation" is defined in TSA's regulations to mean "continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation," all of which, in turn, are defined as "the carriage by aircraft of persons for compensation or hire" in various geographical areas. 49 C.F.R. § 1510.3.

The air carriers themselves, rather than TSA, collect the Fees from passengers and then remit the Fees to TSA. 49 U.S.C. § 44940(e)(2), (3). Carriers remit Fees to TSA once a month, covering all Fees collected the preceding month. *See* 49 C.F.R. § 1510.13(a). Currently, and during the Audit Period, "Fees imposed . . . shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20." 49 U.S.C. § 44940(c)(1).

## B.     Ticket Cancellations on Southwest

When a Southwest ticket is cancelled, Southwest will either (1) credit the amount paid (including airfare, taxes, and Fees) to the customer's method of payment (typically a credit card), referred to as a "method-of-payment refund"; or (2) issue an RTF in that amount. Buckley Decl. ¶¶ 5-7. The former is used for refundable tickets and the latter for both refundable tickets and so-called nonrefundable tickets. *Id.* ¶¶ 6-7. Southwest considers both method-of-payment refunds and RTFs to be refunds to the customer, both are reflected as "refunds" in Southwest's records, and Southwest accounts for both in similar ways. Feinstein Decl. ¶¶ 4-5, 11; Buckley Decl. ¶¶ 5-7, 9-10.

When Southwest issues either a method-of-payment refund or an RTF, all of the accounting entries associated with the sale of the ticket are reversed. Feinstein Decl. ¶ 7. At that time, there is no airfare, taxes, or Fees and the funds at issue are no longer identified in Southwest's records as such. *Id.* ¶ 8. As part of reversing the transaction when a ticket is cancelled in exchange for either a method-of-payment refund or an RTF, Southwest removes the amount of the Fee from its TSA Fee Liability Account by classifying that amount as a "refund," which results in those funds not being paid to TSA (or being recalled from TSA if they had already been paid). *Id.* ¶ 7.

When a customer uses an RTF to purchase a new ticket, the value of that RTF is applied to the new purchase just as if it were a cash purchase. Feinstein Decl. ¶ 9. Among other things,

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 4

when an RTF is used to buy a new ticket, Southwest collects any Fees applicable to that ticket and remits them to TSA at the appropriate time.[2]  *Id.* ¶¶ 6, 9.

If an RTF expires unused, Southwest recognizes the entire amount of the RTF as revenue. *Id.* ¶ 10.  Thus, in the end, TSA receives no Fees when a ticket is cancelled in exchange for an RTF and the RTF later expires unused.  Similarly, TSA receives no Fees when a ticket is cancelled in exchange for a method-of-payment refund or when a ticket is exchanged for an RTF and the RTF is used to purchase a ticket to which no Fee applies (*e.g.*, a ticket for a flight originating outside of the United States).  *Id.* ¶ 9.

## C.     TSA's Claim and the Audit Report

TSA's Claim is based on a review or audit that was conducted on TSA's behalf by U.S. Customs and Border Protection ("CBP").  *See* Claim at 1; Audit Report at 1.  TSA stated that the Audit was authorized by 49 C.F.R. §1510.19.  *See* Claim at 1.  The total purported liability "determined during the review was $22,325,090.55."  *Id.*  In the Claim, TSA stated that it was accepting CBP's audit findings "as evidence of a liability for September 11th Security Fees due to TSA for the audit period of October 1, 2020 through August 31, 2023."  *Id.*  As noted above, the Claim enclosed a copy of CBP's Audit Report.  The Claim does not contain any other explanation of the purported liability.

CBP reviewed several separate areas.  *E.g.*, Audit Report at 1-3.  Only one is relevant here:  "Refunds."  In the "Refund" portion of the Audit, CBP determined Southwest had under-remitted $25,228,375.80 in Fees.  *Id.* at 3.  CBP did not find any underpayments in any other areas.  *Id.* at 1-3.  In the "Refunds" area of the Audit, CBP also determined that Southwest *over*paid a total of $2,903,285.25 in Fees.  *Id.* at 3-4.  CBP netted the $2,903,285.25 overpayment against the supposed $25,228,375.80 underpayment to calculate a net recommended liability against Southwest in the amount of $22,325,090.55.  *Id.* at 3.  Southwest disputes the entirety of the $25,228,375.80 alleged underpayment, and thus challenges the entirety of the $22,325,090.55 purported liability in the Claim and seeks a refund of the remaining $2,903,285.25 that TSA offset against the supposed underpayment.

In the "Refunds" area of the Audit, CBP reviewed a sample of 600 tickets that Southwest treated as having been refunded to the customer.  *Id.* at 2.  That sample was divided into two distinct time periods, which CBP refers to as "Sample Frame 1" and "Sample Frame 2."  *Id.*  CBP divided the sample into two time periods because on July 28, 2022, Southwest changed its policy regarding RTFs such that RTFs did not expired.  *Id.* at 2 n.3.  That remained Southwest's policy for the remainder of the Audit Period.  Buckley Decl. ¶ 7.  Before July 28, 2022, an RTF expired one year after the purchase of the ticket that was exchanged for the RTF.  *Id.*  Sample

---

[2] The number of Fees collected and remitted on tickets purchased with an RTF might be greater or fewer than the number of Fees originally collected on the ticket that was cancelled in exchange for the RTF.  Feinstein Decl. ¶ 9.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 5

Frame 1 covered October 1, 2020, through July 31, 2022 (the last month in the Audit Period in which RTFs could expire). Audit Report at 2. Sample Frame 2 covered August 1, 2022, through August 31, 2023. *Id.*

Sample Frame 1 involved a review of 500 tickets that Southwest treated as refunds. *Id.* Of those, 43 involved tickets that were cancelled in exchange for an RTF and where the RTF expired unused.[3] *Id.* at 3; *id.*, Finding Sheet at 2; *id.*, Appendix III. CBP treated each of those 43 tickets as "errors" and they are the basis of the entire supposed $25,228,375.80 underpayment. *Id.* at 3; *id.*, Finding Sheet at 3. That alleged $25,228,375.80 underpayment was calculated by extrapolating the TSA Fees on the 43 error tickets across all of Southwest's Fee remittances. *Id.*; *id.*, Finding Sheet, Attachment B. As described by CBP:

> For each identified underpayment error, Southwest collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For each of the errors, the passengers did not use the purchased ticket and were issued an RTF by Southwest that went unused and eventually expired. Upon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA.

*Id.*, Appendix III.

CBP also stated that "[t]he determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation[,] as the use or expiration of the RTF is what creates an equitable interest in the fees." *Id.*

Some of the 500 cancelled tickets in Sample Frame 1 were refunded to the customer's credit card or were exchanged for RTFs that were used by the customer to purchase new tickets. *Id.* at 3. CBP did not treat either of these types of tickets as errors. *Id.* CBP also determined that Southwest had *over*paid $376,493.08 in Fees in Sample Frame 1, because Southwest had refunded the Fee on cancelled tickets to the customers' original form of payment, but still remitted the Fee to TSA in error. *Id.* at 3.

CBP did not identify any proposed liability in Sample Frame 2. *Id.* at 4. CBP determined that Southwest had *over*paid $2,526,792.17 in Fees in Sample Frame 2, again because Southwest had refunded the Fee on cancelled tickets to the customers but still remitted the Fees to TSA in error. *Id.* at 4. Adding that $2,526,792.17 overpayment to the $376,493.08

---

[3] In actuality, one of those tickets was exchanged for an RTF that was in turn converted to a Southwest LUV Voucher that expired unused. *See* Audit Report, Finding Sheet, Attachment A at 1 (Ticket Number 2315617653). For ease of reference, we speak of all 43 RTFs as having expired, as does the Audit Report.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 6

overpayment in Sample Frame 1 yields a total of $2,903,285.25 in overpayments.

**D.      TSA's Theory of Liability**

As noted above, in the Claim and Audit Report, TSA and CBP take the position that if a Fee collected on a cancelled ticket is not refunded to the customer, the Fee must be remitted to TSA, even if the customer never engaged in air transportation.  *E.g.*, Audit Report, Appendix III.  TSA and CBP also take the position that an expired RTF does not qualify as a refund.  *E.g.*, *id*.

On the first point, CBP relies on a letter from TSA dated November 21, 2002, to the Air Transport Association (now called Airlines for America), an airline trade association.  *Id.*, Finding Sheet at 2; *id*., Appendix III.  A copy of the letter is attached hereto as Exhibit 6 and is referred to herein as the "2002 Guidance Letter."  The 2002 Guidance Letter addresses the refundability of the Fee "to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel."  Guidance Letter at 1.  The letter states that if a ticket is cancelled and if the "ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee."  *Id*. at 1.  The 2002 Guidance Letter states that if a carrier remits a Fee "to TSA and then refunds the [F]ee to a ticket purchaser, the carrier may offset the refund by deducting it from the [Fees] remitted to TSA for the month in which the refund is provided."  *Id*. at 2.  But, the 2002 Guidance Letter asserts, if "an air carrier does not refund [the Fees] to the ticket purchaser, the [F]ees must be remitted to or remain with TSA."  *Id*.

CBP also relies on a one page TSA "Guidance to Industry" document dated March 20, 2020.  Audit Report, Finding Sheet at 2.  That document states (without any citation to authority):  "If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA."  A copy of that document is attached hereto as Exhibit 7 and is referred to herein as the "2020 Guidance Document."

The Audit Report (*id*., Finding Sheet at 1) and the 2002 Guidance Letter cite a Fee Regulation that states:

> The security service fee must be based on the air travel itinerary at the time the air transportation is sold.  Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate.

49 C.F.R. § 1510.9(b).  The 2002 Guidance Letter cites no other legal authority.

The Audit Report (*id.*, Finding Sheet at 1; *id.*, Appendix III) also cites on 49 C.F.R. § 1510.11(b) which states:

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 7

Security service fees collected by a direct air carrier or foreign air carrier are held
in trust by that direct carrier for the beneficial interest of the United States in
paying for the costs of providing civil aviation security services described in 49
U.S.C. 44940.  The direct air carrier or foreign air carrier holds neither legal nor
equitable interest in the security service fees except for the right to retain any
accrued interest on the principal amounts collected pursuant to § 1510.13(b).

The 2002 Guidance Letter does not explain what qualifies as a "refund" and thus
does not support CBP's second point – that an expired RTF does not qualify as a refund.
Instead, on that point the Audit Report (*id.*, Finding Sheet at 2) cites the 2020 Guidance
Document.  In that regard, the 2020 Guidance Document states that "[r]etaining any
portion of the fee or providing credit towards future services, with or without an
expiration, does not constitute a refund."  *Id.*; *see also* Audit Report, Finding Sheet at 2
(same).  Neither the Audit Report nor the 2020 Guidance Document defines "refund" or
cites any authority for this proposition.

## <u>Argument</u>

The $25,228,375.80 purported overpayment is meritless and should be withdrawn for two
independent reasons.  First, TSA has no authority to assess Fees if the customer does not fly, *i.e.*,
did not engage in air transportation.  In this case, for all 43 supposed "error" tickets at issue the
customer did not fly.  Second, even if TSA were correct that a Fee is owed when the customer
does not fly and the Fee is not refunded to the customer, no Fee is owed to TSA for any of the 43
supposed "error" tickets because when the tickets were cancelled, Southwest provided the
customers with a full refund of all amounts paid (including any Fee amounts) in the form of an
RTF.

## A.    The Fee Statute Does Not Allow TSA to Obtain Any Amount Where the Customer Has Not Flown

TSA has authority to collect a Fee only if a customer actually engages in air
transportation.  If a ticket is cancelled or the customer otherwise does not fly – as is the case with
each of the supposed 43 "errors" at issue – TSA has no authority to collect any amount.

An agency cannot act contrary to a statute and "must give effect to the unambiguously
expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S.
837, 843 (1984); *see also* 5 U.S.C. § 706(2)(A) (agency action that is "not in accordance with
law" must be set aside by a reviewing court).

Nor can an agency act without authority from Congress.  "Agencies are creatures of
Congress; 'an agency literally has no power to act . . . unless and until Congress confers power
upon it.'"  *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (quoting *Louisiana Pub. Serv.
Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  That Congressional authority must be express and

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 8

"the absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) ("no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority"). Congress does not give an agency "plenary authority to act within a given area simply" by giving the agency some authority to act in that area. *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994); *see also FAG Italia*, 291 F.3d at 817 ("The fact that [the agency] is empowered to take action in certain limited situations does not mean that [it] enjoys such power in other instances."). Because Congress gave TSA authority to collect funds under the Fee Statute only when the customer actually engages in air transportation, TSA's attempt to assess what it says are Fees (or to otherwise regulate disposition of funds governed by the private contract between Southwest and its customers) when the customer does not fly is unlawful and must be rejected.

1.     **The Plain Language of the Fee Statute and Fee Regulations Do Not Allow TSA to Obtain Fees When the Ticket Is Cancelled and the Customer Never Flies**

As noted above, the Fee is imposed "on passengers . . . in air transportation." 49 U.S.C. § 44940(a)(1); *see also id.* § 44940(c)(1) (the Fee "shall be $5.60 per on-way trip in air transportation"); 49 C.F.R. § 1510.1 ("fee to be paid by passengers . . . in air transportation"); *id.* § 1510.5 (carriers shall impose a "fee of $5.60 per one-way trip for air transportation"). As also noted above, the Fee Regulations provide a precise definition of "air transportation": "the carriage by aircraft of persons for compensation or hire." *Id.* § 1510.3. As also noted above, the statute contains a similar definition of "air transportation." There is no authority for TSA to obtain any amount unless there is a "passenger" and unless that passenger has actually engaged in "air transportation" by being "carri[ed] by aircraft." When there is no passenger or no air transportation, TSA lacks any statutory and regulatory authority to obtain or otherwise regulate any funds.

This conclusion is separately mandated by the Fee Statute's requirement that the Fee be used only "to pay for" certain "costs of providing civil aviation security services," such as salary, background checks, and training for screening personnel, the cost of the air marshals program, and the cost of training pilots and flight attendants. 49 U.S.C. § 44940(a)(1). There are no such costs for a customer whose ticket is cancelled and never boards a plane.

Likewise, the Fee must be "reasonably related to [TSA's] costs of providing services rendered." *Id.* § 44940(b). Again, if the customer did not engage in air transportation, no services were rendered by TSA to that customer. Consequently, any Fee would be unreasonable and unauthorized by the Fee Statute for this additional reason.

Given the plain language of the Fee Statute, it is not surprising that both TSA and the U.S. Court of Appeals for the District of Columbia Circuit have concluded that "no [F]ees had *ever* been incurred" where the customer had "never used the purchased ticket." *Alaska Airlines,*

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 9

*Inc. v. TSA*, 588 F.3d 1116, 1122-23 (D.C. Cir. 2009) (emphasis added); *accord* Brief of the Respondent at 38, *Alaska Airlines, Inc. v. TSA*, No. 09-1062 (D.C. Cir. Aug. 24, 2009) (attached hereto as Exhibit 8) ("no fees have ultimately been incurred" where the passenger "did not follow through with travel plans, never used the purchased ticket, and thus did not ultimately incur a fee liability").

Because TSA has no authority to obtain a Fee if there is no actual passenger who travels on a plane, none of the supposed 43 "errors" in the Audit can serve as the basis of any Fee liability.

> 2.       **Nothing in § 1510.9(b) of the Fee Regulations Obligates a Carrier to Pay Any Amount to TSA When Customers Do Not Fly and, If Read As TSA Proposes, the Regulation Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute**

As noted above, in both the 2002 Guidance Letter and the Audit Report, TSA and CBP rely on 49 C.F.R. § 1510.9(b), which, again, states:  "The security service fee must be based on the air travel itinerary at the time the air transportation is sold.  Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate."  That regulation cannot support TSA's position. First, even assuming for the moment that this regulation requires a carrier to refund to the customer Fees on cancelled tickets (and it does not, as TSA itself recognizes), nothing in that regulation states that a carrier must pay anything to TSA if the carrier violates that obligation. That is, even if Southwest hypothetically were to violate this provision by failing to give the customer what TSA believes to be a satisfactory refund, TSA has no authority to seize from Southwest the amounts that TSA claims should have been refunded to the customer.  The Fee Regulations have a provision entitled "Enforcement," but that provision does not authorize TSA to collect any amounts other than Fees properly owed under the Fee Statute and Fee Regulations, which is not the case here.  *See* 49 C.F.R. § 1510.21.

Second, and more importantly, even if 49 C.F.R. § 1510.9(b) were read (incorrectly) as suggested by TSA, the regulation would be invalid because it would conflict with, and exceed the authority granted by, the Fee Statute which, as established above, authorizes TSA to obtain funds only when a passenger flies, *i.e.*, engages in air transportation.

Relatedly, neither the 2002 Guidance Letter nor the 2020 Guidance Document is binding on anyone for any purpose.  Indeed, the U.S. Department of Justice would not rely on them in pursuing enforcement actions.  *See* U.S. Department of Justice, Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018) (attached as Exhibit 9); *see also* 84 Fed. Reg. 1820-01 (Feb. 5, 2019) ("As required by the Administrative Procedure Act, the Department does not use guidance documents as a substitute for rulemaking and does not use guidance documents to impose new requirements on entities outside the Executive Branch.").  Neither the 2002 Guidance Letter nor the 2020 Guidance Document is the

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 10

law. In contrast, the law – that is, the Fee Statute and Fee Regulations – imposes no duty on carriers either to refund Fees to customers when tickets are cancelled or to remit those amounts to TSA.

In fact, Congress plainly knows how to craft a statute requiring a carrier to give the customer a refund. Congress did exactly that, for example, with respect to the federal excise tax on air transportation found at 26 U.S.C. § 4261. *See id.* § 6415(a) (providing that a carrier that collected the tax from a customer can obtain a refund of that tax if the carrier "has repaid the amount of such tax to the person from whom [the carrier] collected it, or obtains the consent of such person to the allowance of such credit or refund"). The Fee Statute contains no such provision, however, even though Congress was well aware of the § 4261 excise tax when drafting the Fee Statute, as evidenced by the fact that the Fee Statute explicitly mentions the § 4261 tax. *See* 49 U.S.C. § 44940(e)(5). Moreover, the Fee Statute does contain a provision allowing for refunds by TSA of "any fee paid by mistake or any amount paid in excess of that required." *Id.* § 44940(g). But that section – like the rest of the Fee Statute – contains no requirement that a carrier refund any amounts to the customer.

3.     **If Read As TSA Proposes, § 1510.11(b) of the Fee Regulations Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute. And in Any Event, an RTF Is Not, and Does Not Contain, a "Fee"**

As noted above, TSA and CBP also rely on 49 C.F.R. § 1510.11(b). Again, 49 C.F.R. § 1510.11(b) states that Fees collected by a carrier "are held in trust" by the "carrier for the beneficial interest of the United States" and that the "carrier holds neither legal nor equitable interest in the" Fees (except for the right to keep the interest thereon). 49 C.F.R. § 1510.11(b). According to the Audit Report, "[u]pon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA." Audit Report, Appendix III. This argument fails as both a legal and a factual matter.

On the law, § 1510.11(b) simply cannot override, or exceed the authority granted to TSA by, the Fee Statute. Again, the Fee Statute permits TSA to obtain funds only when the customer actually engages in air transportation. Once the customer's ticket is cancelled and the customer no longer has any right to engage in air transportation, there cannot be any "Fee" and TSA cannot be entitled to any funds. *See, e.g., Alaska Airlines,* 588 F.3d at 1122-23.

As with other similar provisions in the law, the clear intent of § 1510.11(b) is to protect the United States' interests in taxes or fees between the time they are collected by the statutory collector (here, air carriers) and the time they are remitted by the collector to the government. In particular, the fact that the collector holds the funds in trust and does not have a legal or equitable interest in them shields those funds from the collector's creditors in the event of a bankruptcy or other insolvency. *See, e.g., Begier v. IRS,* 496 U.S. 53 (1990) (taxes collected by

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 11

the debtor and held in trust for the United States are not part of the bankruptcy estate). But the purpose of § 1510.11(b) is *not* to define what is a Fee and what is not a Fee. It merely states that *if* an amount is a Fee, then it is held in trust for the United States and the carrier has no legal or equitable interest. Because no Fee is possibly owed once a ticket is cancelled and the customer has no right to air transportation, § 1510.11(b) has no application here.

CBP's argument also fails as a factual matter. Even if a Fee theoretically could exist in connection with a cancelled ticket (and it cannot), under the facts of this case there is no longer any Fee associated with any of the 43 supposed "errors" at issue once the ticket was cancelled and the value that once made up the ticket price is issued to the customer as an RTF. The Audit Report erroneously assumes that the amounts originally collected as Fees continue to be properly characterized as Fees even after the ticket is cancelled and the funds are issued as an RTF. *See* Audit Report, Appendix III. That is wrong. As noted above, once the ticket is cancelled, all of the components of the purchase price – the airfare, taxes, and Fees – cease to exist. *See* Feinstein Decl. ¶¶ 7-8; Buckley Decl. ¶ 9. Instead, at the time the ticket is cancelled, those transactions are reversed and all that remains is a single, non-denominated liability to the customer in the form of the RTF. *Id.* If and when the RTF later expires and Southwest takes the funds at issue as revenue, Southwest takes an interest not in Fees but rather in an asset that, until that time, belonged solely to the customer. Thus, Southwest never takes any interest in any Fees. The Fees ceased to exist once the ticket was cancelled. Moreover, the customer expressly agrees to this process in Southwest's Contract or Carriage.

Under TSA's theory, the trust purportedly created by 49 C.F.R. § 1510.11(b) continued to attach to the funds at issue even though they were converted into an aggregate RTF and even though no ticket for a flight to which the Fee applied existed anymore. According to the Audit Report, "[t]he determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation[,] as the use or expiration of the RTF is what creates an equitable interest in the fees." Audit Report, Appendix III. Not so. There is a completed transaction at the time the ticket is cancelled. It is incorrect for CBP to say that, at that time, it is impossible to know whether a refund has in fact been given. The customer receives value in the form of the RTF as soon as it is issued. Whether and how the customer eventually choses to spend that RTF has no bearing on whether the customer received something of value at the time the RTF was issued.

These reasons demonstrate the absurdity and impropriety of TSA assessing a Fee liability when the customer has not flown, which is precisely what the Audit Report and the Claim seek to do.

## B.     When Issued, RTFs Are Refunds to Customers

The second fundamental flaw in the Claim and Audit Report is their failure to recognize that an RTF qualifies as a "refund" as soon as it is issued. Nothing in the Fee Statute, the Fee Regulations, or the 2002 Guidance Letter defines what qualifies as a "refund" or remotely

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 12

suggests that refunds cannot be given in the form of an RTF or other forms of credit.  While the 2020 Guidance Document states that "providing credit towards future services, with or without an expiration, does not constitute a refund," it cites no authority for that proposition.  The 2020 Guidance Document's unsupported contention is not the law.  Meanwhile, seemingly in conflict with the 2020 Guidance Document and its position on this point, TSA and CBP concede that RTFs that are issued and subsequently used by the customers *do* qualify as refunds, while in the same breath, they incorrectly contend that an expired RTF does not qualify as a refund.  TSA and CBP have not, and cannot, reconcile these opposing positions.

As stated above, the accounting treatment of a cancelled ticket is exactly the same regardless of whether the customer receives a form-of-payment refund or an RTF.  The entire ticket transaction is reversed and, in either event, the full value of the ticket (including airfare, taxes, and Fees) is returned to the customer.  The fact that such value is returned to the customer in the form of an RTF does not change that.

Moreover, a multitude of sources consider RTFs (whether eventually used or not) to be refunds.  That is certainly how Southwest and its employees view RTFs.  *See* Buckley Decl. ¶¶ 5-7, 9-10; Feinstein Decl. ¶¶ 4, 11.  As Ms. Buckley puts it:  "At Southwest, as soon as an RTF is issued and regardless of whether it is eventually used, we consider the RTF to be a refund in every sense of the word."  Buckley Decl. ¶ 9; *see also* Feinstein Decl. ¶ 11 ("From an accounting – and in every other – perspective, RTFs are refunds to customers.  That is true immediately upon the issuance of the RTFs and is true regardless of whether the RTFs are eventually used by the customers.").

Likewise, the agreement between Southwest and its customers (*i.e.*, the Contract of Carriage)[4] makes clear that RTFs are in fact "refunds."  For starters, the Contract of Carriage provisions describing RTFs are found in Section 4.c.(3),[5] with that section coming under a heading (at Section 4.c.) called "Refunds."  Moreover, Section 4.c.(3) states:  the "fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, *except as provided in this Section* and Section 9b."  Contract of Carriage § 4.c.(3)(i) (emphasis added).  Thus, the Contract of Carriage establishes that "refunds" do occur even for so-called nonrefundable tickets, but only as provided in the cited sections of the Contract of Carriage.  That same Section 4.c.(3) then goes to explain the form of the refund:  "Travel Credit.  Unless otherwise stated by the Carrier, the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of

---

[4] The Contracts of Carriage in effect during the period covered by Sample Frame 1 are attached to the Declaration of Elizabeth Behrens (which is attached hereto as Exhibit 10).

[5] For the last few months of the period covered by Sample Frame 1, the relevant Contracts of Carriage (versions 35 and 36) contained the RTFs provisions in Section 4.c.(4).  That section contains similar, but not identical, language to the language from prior Section 4.c.(3) quoted herein.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 13

future travel on Carrier for the originally ticketed Passenger only."[6]  *Id*. § 4.c.(3)(ii).  Notably, "security fees" are included in this very same refund mechanism.  Separately, the Contract of Carriage explains that "[s]hould a Passenger fail to apply the . . . travel credit toward the purchase of future travel within the eligibility period,[7] the entire amount of the fare, including all taxes, security fees, and Passenger Facility Charges, will be forfeited."  *Id*. § 4.c.(3)(iv).  Thus, once the fare is refunded to an RTF, the subsequent treatment and disposition of those aggregate funds is a matter of private contract between Southwest and the customer, and not within the scope of TSA's authority.

Given that the Contract of Carriage considers RTFs to be refunds, it is not surprising that Southwest creates, stores, and modifies RTFs in its "Refund System" which is called "RefundPro."  Buckley Decl. ¶ 10.  And, in the records stored in that that system, RTFs are specifically referred to as "refunds."[8]  Buckley Decl. ¶ 10 & Exhibit A.

Even the CBP auditor from a prior audit of Southwest's Fee compliance referred to RTFs as "refunds" (before coming up with the contrary position).  After Southwest made known to the auditor that it thought the assessment of Fees was prohibited by the Fee Statute and, in any event, that RTFs are refunds, the CBP auditor (Ashley Kervin) sent an e-mail dated July 11, 2017, seeking guidance from Ms. McMenamin, the Compliance Manager for TSA's Office of Revenue.  A copy of that e-mail (and Ms. McMenamin's response) is attached hereto as Exhibit 11.  In that e-mail, Ms. Kervin "first explain[s] Southwest's policy and then Southwest's position."  Exhibit 11 at 2.  In the paragraph describing Southwest's policy Ms. Kervin wrote:

> Southwest allows customers who purchase a nonrefundable airfare ticket and later discover they cannot travel as booked to retain all funds for future use to purchase another ticket to fly on Southwest.  The total amount paid for the cancelled ticket (base fare plus all passenger taxes and fees associated with the itinerary) *is refunded to the customer in the form of a residual travel fund (RTF)*.  Southwest then accepts the RTF's as an acceptable use of payment for the customer to use in

---

[6] The Contract of Carriage uses the phrase "travel credit" or, in versions 35 and 36, "flight credit."  As noted above, those terms are synonymous with RTF.  *See* Buckley Decl. ¶ 7; Feinstein Decl. ¶ 4.

[7] Until July 28, 2022, the eligibility period was one year from the date of the original ticket issuance that is refunded in the form of the travel credit.  Buckley Decl. ¶ 7.

[8] Beyond Southwest, others too consider RTFs to be refunds.  Customers refer to RTFs as refunds when they contact Southwest's Customer Relations department to offer compliments regarding Southwest's advantageous refund policies.  Buckley Decl. ¶ 11.  And, a Forbes article discusses Southwest's favorable "refund policies" and in doing so refers to RTFs as refunds.  *Id*. ¶ 12.  The Forbes article has a section entitled "Refund Policy Overview" that explains that "the price of non-refundable tickets is applied to future travel within one year of the purchase date."  *Id*., Exhibit B at 2-3.  The article continues:  "Since Southwest offers a *free* ticket change policy [*i.e.*, the customer can cancel the ticket and use the resulting RTF to buy a new ticket], *you are getting a full refund* of the price you paid for your ticket to apply towards your next trip."  *Id*., Exhibit B at 3 (first emphasis in original; second emphasis added).

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 14

> booking a future trip.  The customer has one year to use any available RTF and
> upon expiration of the RTF, Southwest books the entire amount to revenue.

*Id.* (emphasis added).  The CBP auditor had it exactly right in this e-mail.

Thus, Southwest, its employees, its policies, its systems, its customers, the press, and even the CBP auditor from the Prior Audit all consider RTFs to be "refunds."  Meanwhile, neither TSA nor CBP has identified any authority suggesting they are not.

Case law also supports the conclusion that RTFs are refunds.  "[T]he plain ordinary meaning of a 'refund' encompasses concepts of distribution by either cash or credit" and "[r]efunds may be issued in cash or in credit."  *Davis v. Central Alabama Electric Cooperative*, No. 15-0131, 2015 WL 5285894, *5 n.7 (S.D. Ala. Sept. 8, 2015).  "For example, modern consumers who return purchases to retailers are well accustomed to receiving refunds in the form of store credit, rather than cash."  *Id.*  "Innumerable examples can be found—both inside and outside the law—of 'refunds' made via credit to an account rather than cash on the barrelhead."  *Id.*; *see also* 7 C.F.R. § 1767.41, § 505.1 ("[i]nsurance policy refunds from mutual companies" can be made "in cash or as credits against subsequent purchases").  For these reasons, the court in *Davis* held that, "as a matter of statutory interpretation," the plaintiff's argument that "patronage refunds" means only "cash refunds" had to be rejected "because the common ordinary meaning of the term 'refunds' embraces both cash and credit varieties."  *Id.*  The court said it "cannot and will not write in the word 'cash' before 'refund' in" the statute at issue.  *Id.*; *see also Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017).

Disputes about what qualifies as a refund of airline ticket taxes have occurred in connection with the federal excise tax on air transportation found at 26 U.S.C. § 4261.  That is because, as noted above, the law allows a carrier to seek a refund of such tax only in limited circumstances, including when the carrier "has repaid the amount of such tax to the person from whom he collected it."  *Id.* § 6415(a).  *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997), involved a dispute about whether "United refunded the full amount of the tax it had collected from the customer" so as to comply with § 6415(a).  *Id.* at 552.  In that case, customers had cancelled their tickets and were subject to penalties from the airline for doing so.  For some types of tickets, the cancellation fees were less than 100% of the amount paid for the ticket.  But if the ticket was for travel from the continental United States to Hawaii, the penalty was 100% of the amount paid for the ticket, including taxes and fees.  The penalties were automatically deducted from the refunds given to the customers.  Thus, customers subject to the 100% penalty received no money back at all after they cancelled their tickets.  Nonetheless, the court held that refunds within the meaning of 26 U.S.C. § 6415(a) were given because the refund and the imposition of the penalty were two separate transactions.

Similarly, the issuance of the RTF when the ticket is cancelled and the potential eventual expiration of the RTF are two separate transactions.  *See* Feinstein Decl. ¶ 10.  If anything, the logic in *United Airlines* applies here with even more force for two reasons.  First, Southwest's

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 15

issuance of a refund to the customer in the form of an RTF and the expiration thereof are separated in time (unlike the refund and simultaneous penalty in the *United Airlines* case). Second, Southwest's customers actually have the ability to use the RTFs for new tickets. Most Southwest customers do exactly that, as evidenced by, among other things, the fact that of the 269 RTFs in Sample Frame 1, 186 "were used by the customer to obtain new tickets" while only 43 expired unused. Audit Report at 3.

Further, the IRS has repeatedly stated that credits of various sorts qualify as "refunds." *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 ("This holding is equally applicable to a situation in which a carrier allows the passenger a refund by credit rather than by cash.");[9] Rev. Proc. 2011-17, 2011-1 C.B. 441 (in connection with a customer returning merchandise, allowing the store to treat the issuance of a gift card to the customer as the equivalent as a cash refund).

Tellingly, as noted above, CBP admits that if the customer is issued an RTF and uses that RTF to purchase another ticket, then a refund has been given. To escape this admission, CBP contends that whether an RTF qualifies as a refund cannot be determined until the customer either uses the RTF to purchase another ticket or the RTF expires unused. *See* Audit Report, Appendix III. In other words, under CBP's view, it is impossible to determine whether a refund has been given until long after a ticket has been cancelled and an RTF has been issued. This illogical result demonstrates a fundamental flaw in that position. Namely, there are two separate transactions, just as there were in the *United Airlines* case: (1) the issuance of the RTF (which is a refund), and (2) the potential expiration and resulting forfeiture of the RTF pursuant to the terms of Southwest's Contract of Carriage. The latter does not and cannot negate the impact of the former. Because an RTF is a refund to the customer as soon as it is issued, the entire purported underpayment of $25,228,375.80 – which is predicated on, among other things, Southwest's alleged failure to have provided adequate refunds – is improper for this second, independent reason.

---

[9] In TSA's decisions on Southwest's prior similar requests for review, TSA stated that Rev. Rul. 89-109 involves an "analogous situation" to the one here. *See, e.g.*, TSA Ltr. to Southwest at 8-9 (Dec. 16, 2024) (Exhibit 12 hereto; without attachments). Yet, TSA ignores the fact that Rev. Rul. 89-109 unambiguously states that a refund via a credit is sufficient.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
March 25, 2025
Page 16

### Conclusion

Because the Fee Statute and Fee Regulations allow TSA to obtain a Fee only when a passenger engages in air transportation and, separately, because an RTF – whether eventually used or not – is a refund at the moment it is issued, Southwest did not underpay $25,228,375.80 in Fees as alleged in the Audit Report. Southwest thus respectfully requests that TSA withdraw the $22,325,090.55 purported liability in the Claim and refund $2,903,285.25 to Southwest.

Sincerely,

Adam P. Feinberg
*Counsel for Southwest Airlines Co.*

Enclosures

TSA Audit Notification Letter



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

February 24, 2025

*Via Express Mail with Delivery Confirmation and Email*

Susan Estrada
Sr. Manager Tax Controversy, Corporate Tax Department
Southwest Airlines
2702 Love Field Dr., HDQ-6TX
Dallas, TX 75235
Email: Susan.Estrada@wnco.com

Adam Feinberg
Miller & Chevalier Chartered
900 16th Street NW
Black Lives Matter Plaza
Washington, DC 20006
Email: AFeinberg@milchev.com

Dear Ms. Estrada and Mr. Feinberg:

The U.S. Customs and Border Protection (CBP) Regulatory Audit Division completed a review of your company regarding compliance with the Passenger Civil Aviation Security Fee (September 11th Security Fee) Regulation during the week of May 14, 2024. CBP conducted this review on behalf of the Transportation Security Administration (TSA) pursuant to an Interagency Agreement, as authorized under regulation (49 CFR Part 1510.19) which provides for authorized representatives to audit or review information necessary to verify that the security services fees have been properly collected and remitted with this part.

The TSA Office of Revenue has received a copy of the review findings and accepts it as evidence of a liability for September 11th Security Fees due to TSA for the audit period of October 1, 2020 through August 31, 2023. This review serves as the final September 11th Security Fee compliance examination of Southwest Airlines for this period. The total September 11th Security Fee liability determined during the review was $22,325,090.55. Please see the enclosed copy of the report for detailed explanations of this liability and findings.

In addition to any civil enforcement actions TSA may take as described below, please be advised that if this debt is not paid in full within 30 days of the date of this letter, the debt will be also considered delinquent for debt collection purposes.  For delinquent debts, Federal law requires TSA to charge interest.  The interest will be charged at the Treasury

Current Value of Funds Rate, along with an administrative charge of $12.00 per month, representing the administrative costs of collection. Furthermore, if the amount assessed is not paid in full within 90 days of the date that the debt becomes delinquent, TSA is required to assess an additional collections-related penalty at an annual rate of 6%, accruing from the date of delinquency. In limited cases, TSA will consider written requests for the use of payment schedules, where justified by economic need and in the public interest. For your convenience, payment instructions are enclosed.

If TSA does not receive $22,325,090.55, the amount due and owing from the carrier, within 30 days of the date of this letter, TSA intends to enforce collection by taking one or more of the following actions:

(1) Administrative Offset -- Should the debt not be paid in full within 30 days, TSA will withhold any funds payable to your company to satisfy the debt.

(2) Treasury Department's Financial Management Service -- Debts that are delinquent for more than 60 days may be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation. Debts that are delinquent for more than 120 days will be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation.

(3) Private Collection Agency -- TSA may forward the debt to a private collection agency.

(4) Credit Bureau Reporting -- TSA may report the debt to commercial credit bureaus and consumer reporting agencies.

(5) Litigation -- TSA may refer the debt to the Department of Justice to initiate litigation to collect the debt.

(6) Federal loans or loan insurance or guaranties -- As required by 31 U.S.C. § 3720B and 31 C.F.R. § 901.6, the United States may decline to extend financial assistance in the form of a loan, loan guarantee, or loan insurance to any entity that is delinquent on a debt owed to a Federal agency. The United States will not extend credit until after the delinquency has been resolved.

(7) Suspension or revocation of eligibility for licenses, permits, or privileges -- TSA may suspend or revoke licenses, permits or any other privileges for any inexcusable or willful failure of a debtor to pay a debt.

Please also be advised that in addition to pursuing debt collection action in the seven options above, TSA is authorized by 49 U.S.C. § 46301 and 49 C.F.R. § 1503.401 to impose a civil penalty against an air carrier for each day that the air carrier failed to remit

a security service fee in accordance with 49 C.F.R. part 1510.  Pursuant to the Homeland Security Act of 2002, the maximum civil penalty is $37,377 per violation.  Each day that an air carrier fails to remit the required security service fee may constitute a separate violation.

Further, failure to remit the September 11th Security Fees may be considered an unfair and deceptive practice in violation of 49 U.S.C. § 41712, requiring referral to the U.S. Department of Transportation for enforcement action.  Finally, information concerning your company's failure to remit security service fees to TSA may be referred to the Department of Transportation's Air Carrier Fitness Division for appropriate consideration with respect to your company's fitness to hold a certificate of public convenience and necessity under 49 U.S.C. § 41102.

You may make a written request for a review of TSA's determination of this compliance review. This includes any matter that may impact this debt determination, imposition, collection, remitting, and refunding of the fee during this audit period. The request must also state the basis for the dispute, including all factual information, documentation, citation to authority, argument, fees remitted in error or any other matters that may directly impact the findings, within 30 days of this notification. TSA will deny any requests raised after this timeframe as untimely. Filing a protest does not relieve the carrier from remitting payment or liability for accruing penalty and administrative charges.

You may send your request to my office by email at tsa-fees@tsa.dhs.gov.

Additionally, you may address any correspondence to:

> U.S. Transportation Security Administration
> Chief Finance Office, Revenue Division
> 6595 Springfield Center Drive, TSA-14
> Springfield, VA 20598-6014

The TSA compliance team greatly appreciates the cooperation and assistance your staff provided during this review.

Sincerely,

*Pamela McMenamin*

Pamela McMenamin
Compliance Manager

Enclosure
        Copy of Compliance Review Report
        Invoice
        Remittance Instructions

Optional Form 1114 (2-79)
Title 7, GAO MANUAL

# BILL FOR COLLECTION

Department, establishment, bureau or office receiving funds:

Department of Homeland Security
Transportation Security Administration
c/o U.S. Coast Guard Finance Center (OG)
1430A Kristina Way, Chesapeake, VA 23326

| | |
|---|---|
| Customer Account Number:  6049 - TSAAVD0181 | |
| Invoice Number | PFFEB25FEB25-D0181AU |
| Date of Invoice | 24-FEB-25 |
| Date Payment Due | 26-MAR-25 |

Bill to: SOUTHWEST AIRLINES
      ATTN: Susan Estrada
      Corporate Tax Department
      2702 Love Field Dr.
      HDQ-6TX
      Dallas, TX  75235
      Email: Susan.Estrada@wnco.com

| Order No. | Article or Services | Amount |
|---|---|---|
| | | (Dollars and Cents) |
| 1 | Passenger Civil Aviation Security Fee (September 11th Security Fee) | **$22,325,090.55** |
| | Audit Scope Period: October 1, 2020-August 31, 2023 | |
| | This invoice is pursuant to Federal Regulation 49 CFR Part 1510 | |
| | which provides for the compliance audit to verify that the security | |
| | fees have been properly collected, refunded, and remitted. | |
| | Original Amount | **$22,325,090.55** |
| | Amount Paid / Credited | $0.00 |
| | **Invoice Due Amount** | **$22,325,090.55** |

Agency Location Code:                 Project Number:

## Payment Instructions

1.  For the September 11th Security Fee, see enclosed remittance instructions and Debt Collection Notice.
2.  Interest, administrative charges and penalties will be assessed on all payments not received by due date.
3.  If you have questions regarding payment method, please contact:

TSA
tsa-fees@tsa.dhs.gov

# Security Fees
# Payment Instructions

Tel: 571-227-2323 / TSA-Fees@tsa.dhs.gov

Air carriers subject to the September 11 Security Fee will not receive an invoice and must initiate monthly payments to TSA according to regulation 49 CFR1510. Please follow any of the payment options below.

## Option A: Pay.Gov

Submit your payment securely online through Pay.Gov. Use direct withdrawl from a U.S. bank account (ACH debit in USD only). There is no fee for this transaction.

**Step 1**    Visit Pay.Gov to pay online if you already have TSA approved access to the September 11th Security Form.*
**Step 2**    Select "My Forms, Private" select "continue" to access the form "September 11th Security Fee."
**Step 3**    Select payment method "ACH Direct Debit" and continue to the form. Ensure your banking institution authorizes direct debit.
**Step 4**    Enter the carrier name, contact information, payment and select payment date.
        Leave the reference number field blank, unless provided in written communication from TSA.   Select "Submit Data."
**Step 5**    Enter the account holder name, account type, routing number, account number.  Select "Submit Data."
**Step 6**    Check the box for the authorization and disclosure statement to finalize and submit your payment.

Be sure to print a copy for your records. If processing another payment, return to the available forms or log out to exit. You will receive an email notification from Pay.Gov once the payment is processed.

## Option B: Wire Transfer

Submit your payment through a wire transfer in USD. To initiate a wire transfer, you must provide the sending bank with the following instructions:

1.    {1510} Type-Subtype : 1000
2.    {2000} Amount: *Provide the USD payment amount. All banking fees are the responsibility of the sender as stipulated in 49 CFR 1510 and are not to deducted from remittance to TSA.*
3.    {3400} Receiver ABA routing number: 021030004 *(This is the routing symbol for the U.S. Treasury at the Federal Reserve Bank in New York)*
4.    {3400} Receiver ABA short name: TREAS NYC
5.    {3600} Business Function Code: CTR *(or CTP)*
6.    {4200} Beneficiary Identifier (account number): 70110001 *(This is the TSA Agency Location Code (ALC). Ensure that the sending bank enters this eight-digit number as shown. If the information is not populated correctly, the Fedwire will be returned.)*
7.    {4200} Beneficiary Name: DHS/TSA
8.    {4200} Beneficiary Address: 6595 Springfield Center Drive, Springfield, VA 20598-6014
9.    {5000} Originator: *Enter the name of the originator of the payment.*
10.    {6000} Originator to Beneficiary Information: "September 11th Security Fee", "Month", "Year", "Amount", and "Carrier Name". *This information is required to ensure that the payment is properly credited to your account.*
***********************The financial institution address for the U.S.Treasury's routing number is 33 Liberty Street, New York, NY 10045***********************

## Option C: Check or Money Order

You may pay with a check drawn from a U.S. bank or money order for fees less than $1,000. Mail to:

Standard
**U.S. Department of Homeland Security**
**Transportation Security Administration**
**P.O. Box 979129**
**St. Louis, MO 63197-9000**

Overnight: Effective October 2023
**U.S. Bank Government Lockbox**
**3180 Rider Trail S.**
**Attn: Government Lockbox, LBX #979129**
**Earth City, MO 63045**

Please be sure to include the proper remittance advice including carrier name, fee month and year. Checks will be processed as an electronic funds transfer within 24 hours and will be shown in the account statement. TSA will keep a copy of the check and the original will be destroyed. TSA is authorized to process the copy in place of the orignal check if there are technical issues in processing. If the eletronic funds transfer cannot be completed due to insufficient funds, TSA may attempt the transfer up to two times. All banking fees are the responsibility of the air carrier.

* If you already have a Pay.Gov account, please email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Security Fee Form. If you do not have a Pay.Gov account, please visit Pay.Gov to enroll, then email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Form.



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**

**AUDIT REPORT**

---

**SOUTHWEST AIRLINES**
**331-23-UF7-UF-29646**
**SEPTEMBER 10, 2024**

**OFFICE OF TRADE**
**TRADE REGULATORY AUDIT**
**CHICAGO**

**WARNING**

**This document is For Official Use Only (FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.**
**CRIMINAL PENALTIES**

**This document contains trade secrets and commercial and financial information relating to the confidential business of private parties.  The Trade Secrets Act (18 U.S.C. § 1905), provides penalties for disclosure of such information.  Federal employees who violate this act by making wrongful disclosures of confidential commercial information may be subject to a personal fine of not more than the greater of $100,000 or, if the person derives a financial gain from the offense, or the offense results in a financial loss to another person, a fine up to twice the gross gain or loss (18 U.S.C. § 3571(b), (d)), imprisonment for not more than one year, or both; and shall be removed from employment.  Also, improper disclosure of certain information contained in this document may constitute a violation of the Privacy Act (5 U.S.C. § 552a) and violators could be subject to a fine of not more than $5,000.**

**SOUTHWEST AIRLINES**
**331-23-UF7-UF-29646**

**TABLE OF CONTENTS**

**SECTION**                                                        **PAGE**

Introduction and Background ........................................................................................... 1

Objectives, Scope, and Methodology .............................................................................. 1

Summary of Audit Results ................................................................................................ 3

Comments of Responsible Officials ................................................................................. 4

Auditor's Rejoinder .......................................................................................................... 4

Other Matters to be Reported ........................................................................................... 5

Schedule of Audit Results ................................................................................................ 6

Findings
      Passenger Civil Aviation Security Service Fee…………………………… Finding Sheet
            Summary of Refund Samples Errors ................................................... Attachment A
            Summary of Refund Sample Error Rate Liability .............................. Attachment B

Summary of Ticket Sample ........................................................................... Appendix I

Comments of Responsible Officials .............................................................. Appendix II

Auditor's Rejoinder ...................................................................................... Appendix III

**FOR OFFICIAL USE ONLY**

**SOUTHWEST AIRLINES**
**331-23-UF7-UF-29646**

## Introduction and Background

U.S. Customs and Border Protection (CBP) completed a Transportation Security Administration (TSA) Passenger Civil Aviation Security Service Fee (Security Fee) Audit of Southwest Airlines (Southwest). The audit fieldwork was performed at Southwest's office located in Dallas, Texas from May 14, 2024 through May 16, 2024.

Southwest was founded in 1971 and is headquartered in Dallas, Texas. Southwest operates flights out of 120 airports across 11 countries. As of July 28, 2022, flight credits issued by Southwest no longer expire.

Southwest remitted $1,915,708,579.95 in TSA Security Fees to TSA during the audit scope period of October 1, 2020 through August 31, 2023.

Southwest's recent CBP audit history includes TSA Security Fee audit report 321-19-UF7-UF-27008, dated August 17, 2021. The scope of the prior audit was November 1, 2016 through March 31, 2019. The previous audit found Southwest was not compliant with TSA regulations for recording, refunding, remitting, and reporting its TSA Security Fees. The non-compliance resulted in a liability of $32,031,605.39 related to Southwest's Residual Travel Fund[1] (RTF) policy.

## Objectives, Scope, and Methodology

The objectives of the audit were to determine if Southwest was compliant with 49 Code of Federal Regulations (C.F.R.) Part 1510, "Imposition and Collection of Passenger Civil Aviation Security Service Fees" as authorized by 49 United States Code (U.S.C.) § 44940, and all associated amendments regarding the imposition, collection, recording, refunding, remitting, and reporting of the fee and to quantify the monetary impact of any noncompliance. The scope period of the audit was October 1, 2020 through August 31, 2023.

To determine if Southwest was compliant with regulations pertaining to the TSA Security Fee and to quantify the monetary impact of any noncompliance, we performed the following procedures:

- evaluated TSA remittance data and Southwest source data to establish preliminary audit concerns and assist in the design of tests;
- informed Southwest of its ability to bring forth any issues that it identified that may impact the audit findings at any time during the audit;
- walked through Southwest's procedures for imposing, collecting, recording, refunding, remitting, and reporting TSA Security Fees;

---

[1] Southwest utilizes Residual Travel Funds (RTFs) for customers who cancel a non-refundable ticket instead of issuing a refund to the customer. When an RTF is created, Southwest reduces the TSA Security Fee liability.

- conducted a walkthrough of Southwest's charter flight activity for April 2023, which included a review of charter contracts and charter revenue documents, to determine if the TSA Security Fees were correctly imposed and collected and determined that no additional testing was necessary;
- identified and validated Southwest's general ledger account used to record TSA Security Fees collections and used as the basis for determining the amount to remit to TSA;
- conducted walkthroughs of six general ledger line items (four debits and two credits) to determine whether the transactions were warranted and in accordance with TSA Security Fee regulations and determined that no additional testing was necessary;
- discussed the sampling methodologies and the extrapolation of errors over the scope period with Southwest personnel and obtained the air carrier's agreement with the sampling methodologies;
- identified and validated a sample universe of 380,184,456 tickets sold using the air carrier's data;
- selected, using ACL Software, a statistical sample of 500 tickets originating in the United States and sold by Southwest to determine if Southwest imposed and collected the TSA Security Fees in accordance with TSA regulations;
- reviewed passenger data for the 500 statistically selected tickets to:
  - identify the total qualifying one-way trips, and,
  - determine if any under/over-imposition or under/over-collection errors existed;
- traced the collection of TSA Security Fees for selected tickets to verify the fees were accurately recorded to Southwest's general ledger;
- identified and validated a sample universe of 55,818,613 refunded tickets[2] totaling $448,821,736.80 using the air carrier's data;
- divided the refund universe into two separate frames based on the changes in Southwest's RTF expiration policy[3]:
  - Sample Frame 1 – October 1, 2020 through July 31, 2022[4], and,
  - Sample Frame 2 – August 1, 2022 through August 31, 2023;
- selected a statistical sample of 600 refunded tickets, 500 refunds with a value of $4,138.40 from Sample Frame 1 and 100 refunds with a value of $756.00 from Sample Frame 2, utilizing ACL software to determine if Southwest refunded the amount of the TSA Security Fee in accordance with TSA regulations;
- reviewed the tickets in the refunded ticket samples to determine if a refund was made directly to the customer, if an RTF was created, if the RTF expired unused; or if the RTF does not expire; and computed error rates for the identified refund errors;
- evaluated all monthly remittances made by Southwest during the audit scope period to determine whether the remittances were submitted to TSA in compliance with the regulations;

---

[2] We refer to the transactions that Southwest treated as refunds in its accounting for and remittance of the TSA Security Fee as "refunded tickets," although in many instances these "refunded tickets" were not actual refunds of the TSA Security Fee and included RTFs that were used by the passenger prior to expiration.

[3] Southwest updated its RTF expiration policy.  Per the new policy, RTFs no longer expire as of July 28, 2022.

[4] Even though Southwest's RTF policy took effect on July 28, 2022, we determined to include all of July 2022 in our first frame since TSA remittances are on monthly basis.

FOR OFFICIAL USE ONLY

- evaluated all quarterly reports submitted by Southwest for the audit scope period to determine whether the reports were submitted to TSA in compliance with regulations; and,
- quantified the monetary impact owed to TSA or to the air carrier resulting from any discrepancies identified.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## **Summary of Audit Results**

We determined Southwest was compliant with TSA regulations pertaining to the imposition and collection of the TSA Security Fee. However, the air carrier was not compliant with TSA regulations pertaining to the recording, refunding, remitting, and reporting of the TSA Security Fee. The monetary impact of noncompliance is $22,325,090.55. Our conclusions are summarized below:

Ticket Sample
Our review of 500 tickets, consisting of 780 qualifying one-way trips, disclosed Southwest correctly imposed and collected TSA Security Fees.

Refunds
*Sample Frame 1 – October 1, 2020 through July 31, 2022*
Our review of 500 tickets identified by Southwest as refunds, consisting of $4,138.40 in TSA Security Fees, disclosed that for 269 tickets the customer received an RTF in lieu of a direct refund. In each of these instances, the collected TSA Security Fees were placed in RTFs and the associated collected fees were deducted from the TSA Security Fee remittance. Of those 269 RTFs, 186 RTFs were used by the customer to obtain new tickets and 13 RTFs were ultimately refunded back to the passenger's credit card through a refund claim. For 43 RTFs, consisting of $375.20 in TSA Security Fees, RTF expired and the associated fees were neither refunded to the passenger in the original form of payment nor remitted to TSA. These 43 errors resulted in an under-remittance, an error rate of 9.0663 percent, and an additional liability of $25,228,375.80.

For 27 RTFs, consisting of $207.20 in TSA Security Fees, that were transferred to RTFs that do not expire. Because RTFs are not compliant with TSA regulations pertaining to refunds, these are errors. However, since the customer can use the RTF at any point in the future, we will not quantify a loss of revenue associated with these errors as a liability at this time.

Our review also disclosed that for one ticket and $5.60 in TSA Security Fees, Southwest refunded the fee in the form of original payment to the ticket purchaser, but still remitted the fee to TSA. The error resulted in an over-remittance, an error rate of 0.1353 percent, and an overpayment of $376,493.08.

*Sample Frame 2 – August 1, 2022 through August 31, 2023*
Our review of 100 tickets identified by Southwest as refunds, with $756.00 of TSA Security Fees, disclosed that for 48 tickets the customer received an RTF in lieu of a direct refund. Of those 48 RTFs, 35 RTFs were used by the customer to obtain new tickets and 4 RTFs were ultimately refunded back to the passenger's credit card through a refund claim.

For nine RTFs, consisting of $72.80 in TSA Security Fees, the value of the RTF does not expire. Because RTFs are not compliant with TSA regulations pertaining to refunds, these are errors. However, since the customer can use the RTF at any point in the future, we will not quantify a loss of revenue associated with these errors as a liability at this time.

For two tickets and $11.20 in TSA Security Fees, Southwest refunded the fees to the ticket purchasers, but still remitted the fees to TSA. The errors resulted in an over-remittance, an error rate of 1.4815 percent, and an overpayment of $2,526,792.17.

<u>Recording and Remittances to TSA</u>
Our review of the general ledger and monthly remittances to TSA disclosed that Southwest used the general ledger to record its TSA Security Fees and remitted the TSA Security Fees recorded in its general ledger. However, the refunding errors identified in the Refund Samples resulted in the recorded amounts and remittance of the TSA Security Fees being incorrect.

<u>Quarterly Reports</u>
As noted above, we identified refunding errors, which Southwest included in its quarterly report data, making the reported figures inaccurate. However, we determined that Southwest submitted its quarterly reporting statistics timely to TSA.

The Schedule of Audit Results and Finding Sheet supporting our conclusions are attached.

## **Comments of Responsible Officials**

Southwest disagreed with the results of the audit and provided comments to the findings. Southwest believes the issuance of an RTF is a refund directly to the passenger and whether the RTF is used or expires is not relevant. Refer to Appendix II for details[5].

## **Auditor's Rejoinder**

We do not agree with Southwest's comment that an RTF is a refund to the passenger and contend that the TSA Security Fees included in the expired RTF value are still owed to TSA; therefore, we made no changes to our audit findings. Refer to Appendix III for details.

---

[5] Southwest provided its comments in a letter dated August 30, 2024. The letter referenced a Request for Review dated November 23, 2021, and its exhibits. Due to the volume of the exhibits to the November 23, 2021 Request for Review, we did not include them in Appendix II.

**<u>Other Matters to be Reported</u>**

While reviewing the refund samples, we identified tickets that were transferred to RTFs that do not expire. In Sample 1, 27 tickets, consisting of $207.20 in TSA Security Fees, were transferred to RTFs that do not expire, and had a potential projected value of $13,932,191.97. To calculate the potential projected value, we first divided the TSA Security Fee amount in RTFs that do not expire of $207.20 by the total TSA Security Fee amount in the sample of $4,138.40 resulting in a projection rate of 5.0068 percent. Next, we projected the rate over the monthly TSA Security Fee refunds for the appropriate time frame and calculated a potential projected amount of $13,932,191.97.

In Sample 2, 9 tickets, consisting of $72.80 in TSA Security Fees, were transferred to RTFs that do not expire, and had a potential projected value of $16,423,893.15. To calculate the potential projected value, we first divided the TSA Security Fee amount in RTFs that do not expire of $72.80 by the total TSA Security Fee amount in the sample of $756 resulting in a projection rate of 9.6296 percent. Next, we projected the rate over the monthly TSA Security Fee refunds for the appropriate time frame and calculated a potential projected amount of $16,423,893.15.

PAUL K
VINKLER

Digitally signed by
PAUL K VINKLER
Date: 2024.09.10
13:32:18 -05'00'

for Kevin Bridgford
Field Director
Office of Trade
Trade Regulatory Audit
Chicago, Illinois

**SOUTHWEST AIRLINES**
**331-23-UF7-UF-29646**

**Schedule of Audit Results**

| Finding Sheet | TSA Security Fee | Compliance with TSA Security Fee Regulations | Net Liability/ (Overpayment)* |
|---|---|---|---|
| Not Applicable | Ticket Sample | Compliant | $0.00 |
| 1 | Refund Sample – Sample Frame 1 | Not Compliant | $24,851,882.72 |
| 1 | Refund Sample – Sample Frame 2 | Not Compliant | ($2,526,792.17) |
| 1 | Recording and Remittance to TSA | Not Compliant | $0.00 |
| 1 | Quarterly Reports | Not Compliant | $0.00 |
| | **Total Liability** | | $22,325,090.55 |

*TSA Office of Revenue will determine if interest and penalty amounts are due on the TSA Security Fees collected by the air carrier but not remitted. Interest and penalties may be computed from the period when the fees have been remitted and the air carrier will be invoiced for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) may be subject to interest and penalty.

**SOUTHWEST AIRLINES
TRANSPORTATION SECURITY ADMINISTRATION
PASSENGER CIVIL AVIATION SECURITY SERVICE FEE**

## Audit Area Objective

To determine if Southwest Airlines (Southwest) was compliant with Transportation Security Administration (TSA) Passenger Civil Aviation Security Service Fee (Security Fee) regulations pertaining to the imposition, collection, recording, refunding, remitting, and reporting of the fee as mandated by Title 49 Code of Federal Regulations (C.F.R.) Part 1510, and quantify the monetary impact of any instances of noncompliance.

## Conclusion

Southwest was compliant with the TSA regulations pertaining to the imposition and collection of TSA Security Fees.  However, the air carrier was not compliant with the TSA regulations pertaining to the recording, refunding, remitting, and reporting of TSA Security Fees, resulting in a net liability of $22,325,090.55.

## Criteria

Title 49 C.F.R. § 1510.5(a) states that air carriers shall impose a TSA Security Fee of $5.60 per one-way trip for air transportation originating at an airport in the United States, and passengers may not be charged more than $5.60 per one-way trip or $11.20 per round trip.

Title 49 C.F.R. § 1510.9(b) states that carriers must collect a TSA Security Fee from each passenger for air transportation sold on or after February 1, 2002.  The TSA Security Fee must be based on the air travel itinerary at the time the air transportation is sold.  Any changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection or refund of the TSA Security Fee by the carrier.

Title 49 C.F.R. § 1510.11(b) states TSA Security Fees collected by a direct air carrier are held in trust by that direct air carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services.  The direct air carrier holds neither legal nor equitable interest in the TSA Security Fees except for the right to retain any accrued interest on the principal amounts collected.

Title 49 C.F.R. § 1510.13(a) states that each carrier must remit all TSA Security Fees imposed each calendar month to TSA by the last calendar day of the month following imposition.

Title 49 C.F.R. § 1510.15(a) states that carriers must maintain an accounting system to properly record the TSA Security Fees that are imposed, collected, refunded, and remitted.  The accounting records must identify the airports at which the passengers were enplaned.

**FOR OFFICIAL USE ONLY**

Title 49 C.F.R. § 1510.17 states that each carrier collecting TSA Security Fees must provide TSA with quarterly reports that provide an accounting of fees imposed, collected, refunded, and remitted by the last day of the calendar month following the quarter of the calendar year in which the fees were imposed.

TSA-02-11120-59 Guidance to Industry, dated November 21, 2002, states, in part, that although 49 C.F.R. Part 1510 does not address in detail how refunds are to be handled, it clearly indicates that air carriers and foreign air carriers are responsible for refunding TSA Security Fees to ticket purchasers.  Specifically, it provides that "any changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier as appropriate."  When a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the TSA Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser.  If such a ticket purchaser requests a refund of the TSA Security Fee collected, the carrier must provide the requester with a full refund of the fee in any case where air carrier does not refund the TSA Security Fee to the ticket purchaser, the fees must be remitted or remain with TSA."

TSA Guidance to Industry letter, dated March 20, 2020, stated that when requested by a passenger, TSA considers a TSA Security Fee refund a return of payment preferably in the form of original payment.  Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund.

## **Condition**

### Refunds
*Refund Sample 1 – October 1, 2020 through July 31, 2022*
We reviewed 500 tickets identified as refunds by Southwest, consisting of $4,138.40 in TSA Security Fees, of which 269 tickets were instances where the customer received an RTF in lieu of a direct refund.  Of the 269 issued RTFs, 199 RTFs were either used to purchase new air transportation or the customer received a refund to their credit card.  For 43 RTFs, consisting of $375.20 in TSA Security Fees, the fees were collected from the customer but neither refunded to the customer nor remitted to TSA upon expiration of the RTF.  For 27 RTFs, consisting of $207.20 in TSA Security Fees, the fees transferred to the RTFs do not expire.  Finally, we identified one ticket, consisting of $5.60 in TSA Security Fees, where the fees were refunded directly to the customer, but still remitted to TSA.

*Refund Sample 2 – August 1, 2022 through August 31, 2023*
We reviewed 100 tickets identified as refunds by Southwest, consisting of $756.00 in TSA Security Fees, of which 48 tickets were instances where the customer received and RTF in lieu of a direct refund.  Of the 48 issued RTFs, 39 RTFs were either used to purchase new air transportation or the customer received a refund to their credit card.  For nine RTFs, consisting of $72.80 in TSA Security Fees, the fees transferred to the RTFs do not expire.  Finally, we identified two tickets, consisting of $11.20 in TSA Security Fees, where the fees were refunded directly to the customer, but still remitted to TSA.

**FOR OFFICIAL USE ONLY**

<u>Recording and Remittance to TSA</u>
As stated above, Southwest was not compliant with TSA regulations pertaining to the refunding of the TSA Security Fee due to errors identified in the refund samples.  Southwest incorporated these errors in its recording of the TSA Security Fee and its remittances to TSA, which resulted in its remittances being incorrect.

<u>Quarterly Reports</u>
As stated above, Southwest was not compliant with TSA regulations pertaining to the refunding of the TSA Security Fee due to errors identified in the refund samples.  Southwest incorporated these errors in its quarterly report data, which resulted in its quarterly report data being incorrect.

**Effect**

*Refund Sample 1 – October 1, 2020 through July 31, 2022*
The $375.20 in imposed and collected TSA Security Fees that were not refunded directly to the customer nor remitted to TSA once the RTF expired resulted in an under-remittance to TSA and refunding error rate of 9.0663 percent.  We projected the results of the refunding errors over the appropriate time frame and quantified a TSA Security Fee liability of $25,228,375.80.

The $5.60 in imposed and collected TSA Security Fees that were refunded directly to the customer, but still remitted to TSA, resulted in an over-remittance to TSA and refunding error rate of 0.1353 percent.  We projected the results of the refunding error over the appropriate time frame and quantified a TSA Security Fee overpayment of $376,493.08.

Attachments A (Summary of Refund Sample Errors) and B (Summary of Refund Sample Error Liability) contain additional information about the errors and the extrapolation of the errors over the scope period.

The 27 tickets, consisting of $207.20 in TSA Security Fees, that were transferred to RTFs that do not expire are not compliant with TSA regulations pertaining to refunds and are errors.  However, since the customer can use the RTF at any point in the future, we will not quantify a loss of revenue associated with these errors at this time.

*Refund Sample 2 – August 1, 2022 through August 31, 2023*
The $11.20 in imposed and collected TSA Security Fees that were refunded directly to the customer, but still remitted to TSA, resulted in an over-remittance to TSA and refunding error rate of 1.4815 percent.  We projected the results of the refunding error over the appropriate time frame and quantified a TSA Security Fee overpayment of $2,526,792.17.  Attachments A (Summary of Refund Sample Errors) and B (Summary of Refund Sample Error Liability) contain additional information about the errors and the extrapolation of the errors over the scope period.

The nine tickets, consisting of $72.80 in TSA Security Fees, that were transferred to RTFs that do not expire are not compliant with TSA regulations pertaining to refunds and are errors.

However, since the customer can use the RTF at any point in the future, we will not quantify a loss of revenue associated with these errors at this time.

**Recommendations**

We recommend that TSA properly address the net liability of $22,325,090.55.

**Comments of Responsible Officials**

Southwest disagreed with the audit results and provided comments to the findings. Southwest believes the issuance of an RTF is a refund directly to the passenger and whether the RTF is used or expires is not relevant. Refer to Appendix II for details.

**Auditor's Rejoinder**

We do not agree with Southwest's comment that an RTF is a refund to the passenger and contend that the TSA Security Fees included in the expired RTF value are still owed to TSA; therefore, we made no changes to our audit findings. Refer to Appendix III for details.

**FOR OFFICIAL USE ONLY**

# SOUTHWEST AIRLINES
## Transportation Security Administration
## Passenger Civil Aviation Security Service Fee

### SUMMARY OF REFUND SAMPLE 1 ERRORS – RELATED TO RTFs

| Ticket Number | TSA Value of Error | Description of Error |
|---|---|---|
| 2326342244 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2317074333 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2304872236 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2328141202 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2309590049 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2330668446 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2332939035 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2315617653 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket was converted to a SLV[6].  The SLV expired unused. |
| 2335857781 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2326096802 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2338587356 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2324248568 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2336340791 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2336894620 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2338917600 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2349939252 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2350896415 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |

---

[6] An "SLV" is a Southwest LUV Voucher, which can be issued as a gesture of goodwill.

FOR OFFICIAL USE ONLY

| Ticket Number | TSA Value of Error | Description of Error |
|---|---|---|
| 2355222095 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2366945471 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2353354003 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2374630721 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2363075841 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2371144212 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2371281764 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2391843836 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2393963759 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2398170441 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1402572755 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1410547987 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1407733314 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2375623514 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2387945731 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1412165784 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2398493963 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2397709355 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2393316363 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1418372526 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1424685759 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |

**FOR OFFICIAL USE ONLY**

| Ticket Number | TSA Value of Error | Description of Error |
|---|---|---|
| 1418163585 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 2390355168 | $5.60 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1439026624 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1486057928 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |
| 1474344501 | $11.20 | The RTF issued in lieu of direct refunds to the customer for this ticket expired unused. |

## SUMMARY OF REFUND SAMPLE ERRORS – RELATED TO REFUNDS STILL REMITTED TO TSA

| Sample | Ticket Number | TSA Value of Error | Description of Error |
|---|---|---|---|
| Sample 1 | 1431946098 | ($5.60) | The TSA Security Fee was refunded directly to the customer; however, it was still remitted to TSA. |
| Sample 2 | 7876734060 | ($5.60) | The TSA Security Fee was refunded directly to the customer; however, it was still remitted to TSA. |
| Sample 2 | 2455860738 | ($5.60) | The TSA Security Fee for one one-way trip was refunded directly to the customer; however, it was still remitted to TSA. |

**FOR OFFICIAL USE ONLY**

**SOUTHWEST AIRLINES**
**Transportation Security Administration**
**Passenger Civil Aviation Security Service Fee**

**SUMMARY OF REFUND SAMPLES ERROR RATE LIABILITY**

| | Sample 1 | Sample 2 |
|---|---|---|
| **Time Period:** | 10/1/2020 - 7/31/2022 | 8/1/2022 - 8/31/2023 |
| **TSA Security Fee in Sample Frame [a]:** | $4,138.40 | N/A |
| **TSA Security Fee Collected but not Refunded [b]:** | $375.20 | N/A |
| **Error Rate [c] = b / a:** | 9.0663% | N/A |
| | | |
| **TSA Security Fee in Sample Frame [d]:** | $4,138.40 | $756.00 |
| **TSA Security Fee Refunded but Still Remitted [e]:** | $5.60 | $11.20 |
| **Error Rate [f] = e / d:** | 0.1353% | 1.4815% |

| Year | Month | TSA Security Fee in Sample Universe [g] | Expired Unused RTF Liability [h] = g *c | TSA Security Fees Refunded but still Remitted (Overpayment) [i] = -(g*f) | TSA Security Fee Liability or (Overpayment) [j] = h + i |
|---|---|---|---|---|---|
| 2020 | October | $10,696,845.60 | $969,808.11 | ($14,472.83) | $955,335.28 |
| | November | $13,832,672.00 | $1,254,111.54 | ($18,715.61) | $1,235,395.93 |
| | December | $13,445,605.60 | $1,219,018.94 | ($18,191.90) | $1,200,827.04 |
| 2021 | January | $9,702,134.40 | $879,624.61 | ($13,126.99) | $866,497.62 |
| | February | $9,458,495.20 | $857,535.55 | ($12,797.34) | $844,738.21 |
| | March | $10,868,984.00 | $985,414.70 | ($14,705.74) | $970,708.96 |
| | April | $10,213,660.80 | $926,001.13 | ($13,819.08) | $912,182.05 |
| | May | $11,149,079.20 | $1,010,808.97 | ($15,084.70) | $995,724.27 |

FOR OFFICIAL USE ONLY

| Year | Month | TSA Security Fee in Sample Universe [g] | Expired Unused RTF Liability [h] = g *c | TSA Security Fees Refunded but still Remitted (Overpayment) [i] = -(g*f) | TSA Security Fee Liability or (Overpayment) [j] = h + i |
|---|---|---|---|---|---|
| | June | $12,844,244.00 | $1,164,497.69 | ($17,378.26) | $1,147,119.43 |
| | July | $12,765,328.80 | $1,157,343.00 | ($17,271.49) | $1,140,071.51 |
| | August | $17,899,616.00 | $1,622,832.89 | ($24,218.18) | $1,598,614.71 |
| | September | $16,124,868.00 | $1,461,928.91 | ($21,816.95) | $1,440,111.96 |
| | October | $15,034,958.40 | $1,363,114.43 | ($20,342.30) | $1,342,772.13 |
| | November | $11,237,850.40 | $1,018,857.23 | ($15,204.81) | $1,003,652.42 |
| | December | $14,018,872.00 | $1,270,992.99 | ($18,967.53) | $1,252,025.46 |
| 2022 | January | $17,584,565.60 | $1,594,269.47 | ($23,791.92) | $1,570,477.55 |
| | February | $12,171,331.20 | $1,103,489.40 | ($16,467.81) | $1,087,021.59 |
| | March | $11,669,033.60 | $1,057,949.59 | ($15,788.20) | $1,042,161.39 |
| | April | $11,674,308.80 | $1,058,427.86 | ($15,795.34) | $1,042,632.52 |
| | May | $11,293,352.00 | $1,023,889.17 | ($15,279.91) | $1,008,609.26 |
| | June | $12,444,941.60 | $1,128,295.74 | ($16,838.01) | $1,111,457.73 |
| | July | $12,134,651.20 | $1,100,163.88 | ($16,418.18) | $1,083,745.70 |
| | August | $13,326,107.20 | $0.00 | ($197,426.28) | ($197,426.28) |
| | September | $13,461,246.40 | $0.00 | ($199,428.37) | ($199,428.37) |
| | October | $12,639,424.00 | $0.00 | ($187,253.07) | ($187,253.07) |
| | November | $11,996,465.60 | $0.00 | ($177,727.64) | ($177,727.64) |
| | December | $20,474,546.40 | $0.00 | ($303,330.40) | ($303,330.40) |
| 2023 | January | $16,967,126.40 | $0.00 | ($251,367.98) | ($251,367.98) |
| | February | $10,592,248.80 | $0.00 | ($156,924.17) | ($156,924.17) |
| | March | $12,146,612.80 | $0.00 | ($179,952.07) | ($179,952.07) |
| | April | $11,759,708.80 | $0.00 | ($174,220.09) | ($174,220.09) |
| | May | $10,456,079.20 | $0.00 | ($154,906.81) | ($154,906.81) |

FOR OFFICIAL USE ONLY

| Year | Month | TSA Security Fee in Sample Universe [g] | Expired Unused RTF Liability [h] = g *c | TSA Security Fees Refunded but still Remitted (Overpayment) [i] = -(g*f) | TSA Security Fee Liability or (Overpayment) [j] = h + i |
|---|---|---|---|---|---|
| | June | $12,205,485.60 | $0.00 | ($180,824.27) | ($180,824.27) |
| | July | $10,555,910.40 | $0.00 | ($156,385.81) | ($156,385.81) |
| | August | $13,975,376.80 | $0.00 | ($207,045.21) | ($207,045.21) |
| | **Totals:** | **$448,821,736.80** | **$25,228,375.80** | **($2,903,285.25)** | **$22,325,090.55** |

**SOUTHWEST AIRLINES**
**Transportation Security Administration**
**Passenger Civil Aviation Security Service Fee**

**SUMMARY OF TICKET SAMPLE**

| | |
|---|---|
| **Qualifying One-Way Trips [a]** | 780 |
| **TSA Security Fee Not Imposed / Collected [b]:** | 0 |
| **Error Rate [c] = [b] / [a]:** | 0.0000% |

| Year | Period | Net Collections Posted to General Ledger<br><br>(d) | Error Rate Liability<br><br>(e) = (d) / [1 - (c)] - (d) | Total TSA Security Fees Due<br><br>(f) = (d) + (e) | TSA Security Fees Remitted<br><br>(g) | TSA Security Fee Liability or (Overpayment)<br><br>(h) = (f) - (g) |
|---|---|---|---|---|---|---|
| 2020 | October | $23,446,130.20 | $0.00 | $23,446,130.20 | $23,446,130.20 | $0.00 |
| | November | $14,230,073.02 | $0.00 | $14,230,073.02 | $14,230,073.02 | $0.00 |
| | December | $18,007,166.80 | $0.00 | $18,007,166.80 | $18,007,166.80 | $0.00 |
| 2021 | January | $35,003,971.53 | $0.00 | $35,003,971.53 | $35,003,971.53 | $0.00 |
| | February | $34,760,885.60 | $0.00 | $34,760,885.60 | $34,760,885.60 | $0.00 |
| | March | $55,410,435.77 | $0.00 | $55,410,435.77 | $55,410,435.77 | $0.00 |
| | April | $58,460,261.60 | $0.00 | $58,460,261.60 | $58,460,261.60 | $0.00 |
| | May | $57,570,523.35 | $0.00 | $57,570,523.35 | $57,570,523.35 | $0.00 |
| | June | $71,283,995.60 | $0.00 | $71,283,995.60 | $71,283,995.60 | $0.00 |
| | July | $48,401,383.30 | $0.00 | $48,401,383.30 | $48,401,383.30 | $0.00 |
| | August | $39,541,373.00 | $0.00 | $39,541,373.00 | $39,541,373.00 | $0.00 |
| | September | $50,756,194.74 | $0.00 | $50,756,194.74 | $50,756,194.74 | $0.00 |

FOR OFFICIAL USE ONLY

| Year | Period | Net Collections Posted to General Ledger<br><br>(d) | Error Rate Liability<br><br>(e) = (d) / [1 - (c)] - (d) | Total TSA Security Fees Due<br><br>(f) = (d) + (e) | TSA Security Fees Remitted<br><br>(g) | TSA Security Fee Liability or (Overpayment)<br><br>(h) = (f) - (g) |
|---|---|---|---|---|---|---|
| | October | $54,252,331.43 | $0.00 | $54,252,331.43 | $54,252,331.43 | $0.00 |
| | November | $49,066,702.20 | $0.00 | $49,066,702.20 | $49,066,702.20 | $0.00 |
| | December | $39,204,104.18 | $0.00 | $39,204,104.18 | $39,204,104.18 | $0.00 |
| 2022 | January | $57,245,817.20 | $0.00 | $57,245,817.20 | $57,245,817.20 | $0.00 |
| | February | $58,994,885.40 | $0.00 | $58,994,885.40 | $58,994,885.40 | $0.00 |
| | March | $72,309,636.60 | $0.00 | $72,309,636.60 | $72,309,636.60 | $0.00 |
| | April | $58,998,664.90 | $0.00 | $58,998,664.90 | $58,998,664.90 | $0.00 |
| | May | $59,869,673.20 | $0.00 | $59,869,673.20 | $59,869,673.20 | $0.00 |
| | June | $72,443,261.20 | $0.00 | $72,443,261.20 | $72,443,351.20 | -$90.00 |
| | July | $59,338,380.73 | $0.00 | $59,338,380.73 | $59,338,290.73 | $90.00 |
| | August | $65,693,119.62 | $0.00 | $65,693,119.62 | $65,693,119.62 | $0.00 |
| | September | $60,975,074.30 | $0.00 | $60,975,074.30 | $60,975,074.30 | $0.00 |
| | October | $64,269,299.04 | $0.00 | $64,269,299.04 | $64,269,299.04 | $0.00 |
| | November | $57,305,871.78 | $0.00 | $57,305,871.78 | $57,305,871.78 | $0.00 |
| | December | $35,636,778.20 | $0.00 | $35,636,778.20 | $35,636,778.20 | $0.00 |
| 2023 | January | $69,064,420.00 | $0.00 | $69,064,420.00 | $69,064,420.00 | $0.00 |
| | February | $62,957,134.44 | $0.00 | $62,957,134.44 | $62,957,134.44 | $0.00 |
| | March | $72,300,686.24 | $0.00 | $72,300,686.24 | $72,300,686.24 | $0.00 |
| | April | $62,372,781.98 | $0.00 | $62,372,781.98 | $62,372,781.98 | $0.00 |
| | May | $61,075,561.30 | $0.00 | $61,075,561.30 | $61,075,561.30 | $0.00 |
| | June | $87,311,241.26 | $0.00 | $87,311,241.26 | $87,311,241.26 | $0.00 |
| | July | $60,330,285.74 | $0.00 | $60,330,285.74 | $60,330,285.74 | $0.00 |

FOR OFFICIAL USE ONLY

| Year | Period | Net Collections Posted to General Ledger (d) | Error Rate Liability (e) = (d) / [1 - (c)] - (d) | Total TSA Security Fees Due (f) = (d) + (e) | TSA Security Fees Remitted (g) | TSA Security Fee Liability or (Overpayment) (h) = (f) - (g) |
|---|---|---|---|---|---|---|
|  | August | $67,820,474.50 | $0.00 | $67,820,474.50 | $67,820,474.50 | $0.00 |
| Total |  | $1,915,708,579.95 | $0.00 | $1,915,708,579.95 | $1,915,708,579.95 | $0.00 |

FOR OFFICIAL USE ONLY

## SOUTHWEST AIRLINES
## COMPANY COMMENTS

Miller **&** Chevalier

**Adam P. Feinberg**
Member
202.626.6087
afeinberg@milchev.com

August 30, 2024

**VIA E-MAIL AND FIRST-CLASS MAIL**

Ms. Ashley Kervin
Regulatory Audit and Agency Advisory Services
U.S. Customs and Border Protection
Department of Homeland Security
610 South Canal Street
Chicago, Illinois 60607
E-mail: ASHLEY.E.KERVIN@cbp.dhs.gov

    Re:    September 11ᵗʰ Security Service Fee Audit of Southwest Airlines Co.

Dear Ms. Kervin:

    We represent Southwest Airlines Co. ("Southwest") in connection with the audit (the "Audit") that you, on behalf of the Transportation Security Administration ("TSA"), have been conducting of Southwest's compliance with the September 11th Security Service Fee created by 49 U.S.C. § 44940 (the "Fee") for the period October 1, 2020, through August 31, 2023. We understand that you have completed your audit work and that you intend to recommend a net Fee liability assessment against Southwest in the amount of $22,325,090.55, based on a purported underpayment of $25,228,375.80 netted against overpayments of $376,493.08 and $2,526,792.17. We also understand that the entirety of the purported $25,228,375.80 underpayment relates to instances where a Southwest customer cancelled a ticket, Southwest transferred the value of the ticket (including airfare, taxes, and Fees) to a Residual Travel Fund ("RTF"), and where the customer did not use the RTF and instead let it expire unused (all of which instances relate to the period October 1, 2020, through July 31, 2022). As you know, an RTF – which is sometimes called a "travel credit" – is an electronic account in the customer's name and constitutes an acceptable form of payment for future ticket purchases; an RTF is essentially a virtual credit card or a gift card.

    We also understand that you have requested that Southwest supply you with comments to the proposed assessment in advance of the Audit's exit conference. This letter and the enclosures serve as Southwest's comments. In sum, Southwest believes that the purported underpayment of $25,228,375.80 is wrong as a legal and factual matter, that the proposed assessment is legally unsupportable and should be withdrawn in full, and that the $376,493.08 and $2,526,792.17 overpayments should be refunded to Southwest promptly.

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
**T** 202.626.5800 . millerchevalier.com

August 30, 2024
Page 2

    As you probably know, in 2017 and then again in 2021, CBP, on behalf of TSA, conducted similar Fee audits of Southwest, and recommended liability assessments against Southwest for the same exact issue on which the proposed assessment in the current Audit is based. Subsequently, TSA issued assessments against Southwest, and Southwest submitted Requests for Review of those assessment to TSA on August 9, 2018 and November 23, 2021. Enclosed please find a copy of the November 23, 2021 Request for Review (including the exhibits thereto). TSA has not responded to either of these Request for Review. The enclosed Request for Review explains Southwest's position as to why the proposed assessment and finding of a purported underpayment of $25,228,375.80 are improper. The arguments made by Southwest in that Request for Review apply with equal force to the current Audit. Southwest thus requests that you issue an audit report with no recommended Fee liability assessment and that provides for the prompt refund to Southwest of the $376,493.08 and $2,526,792.17 overpayments.

    We thank you in advance for your attention to these issues.

                    Sincerely,

                    Adam P. Feinberg

cc:    Angela Mayeux, Esquire (via e-mail only)
       Kenneth Guckian (via e-mail only)
       Susan Estrada (via e-mail only)
       Kiki Gao (via e-mail only)

**FOR OFFICIAL USE ONLY**

# Miller & Chevalier

Adam P. Feinberg
Member
(202) 626-6087
afeinberg@milchev.com

November 23, 2021

**Via Overnight Delivery and Via E-Mail (tsa-fees@dhs.gov)**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
Office of Revenue
6595 Springfield Center Drive
Springfield, Virginia  20598-6014

Re:    Southwest Airlines Co.'s Request for Review of TSA's Claim of Liability
    Relating to September 11th Security Service Fees

Dear Ms. McMenamin:

Pursuant to 49 C.F.R. § 89.21, Southwest Airlines Co. ("Southwest") respectfully submits this letter and the attachments hereto in further support of its request for review of the validity and amount of the $32,031,605.39 claim of liability made by the Transportation Security Administration ("TSA") against Southwest in connection with Southwest's collection and remittance of the September 11th Security Service Fee imposed on air transportation passengers (the "Fee").  A copy of that claim of liability, dated September 13, 2021, is attached as Exhibit 1 and is referred to herein as the "Claim."  A copy of the "Bill for Collection" accompanying the Claim is attached as Exhibit 2.  As you know from Southwest's previous submissions, Southwest disputes the entire $32,031,605.39 purported liability in the Claim.

The Claim is based on a review or audit of Southwest's compliance with the September 11th Security Service Fee statute, 49 U.S.C. § 44940 (the "Fee Statute") and TSA's regulations thereunder, 49 C.F.R. §§ 1510.1-1510.21 (the "Fee Regulations").  That review or audit (the "Audit") covers the period November 1, 2016, through March 31, 2021 (the "Audit Period").  The Audit culminated in a written audit report dated August 17, 2021, that was enclosed with the Claim and is attached hereto as Exhibit 3 (the "Audit Report").[1]

---

[1] The Claim (at 1) erroneously states that the Audit Period began on November 16, 2016.  The Audit Report correctly shows the start of the Audit Period as November 1, 2016.  *See* Audit Report at 1.

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

**FOR OFFICIAL USE ONLY**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 2

As I explained to you in my e-mail dated October 25, 2021 (included in Exhibit 4), the Claim was not sent to the correct Southwest individuals and was not received by the correct individuals until October 25, 2021. Susan Estrada (Southwest's Senior Manager of Audits and Special Projects) is Southwest's designated official contact for this matter. *See* Declaration of Susan Estrada ("Estrada Decl.") ¶¶ 4-6 & Exs. A & B.[2] And, as you know, I am Southwest's legal counsel in this matter. *See* Audit Report, Appendix I at 1. However, the Claim was not sent to Ms. Estrada or to me and instead was sent to the office address of Denyel Bosworth, a Senior Tax Accountant at Southwest. *See* Claim at 1. Due to COVID-19, Ms. Bosworth has been working from home and her office mail is not regularly monitored. *See* Declaration of Denyel Bosworth ("Bosworth Decl.") ¶ 6.[3] The package containing the Claim was not opened until October 25, 2021. *Id.* ¶ 7; Estrada Decl. ¶ 8. Because the Claim was not sent to the correct representatives of Southwest and was not actually received by the correct representatives until October 25, 2021, the 30 day period under 49 C.F.R. § 89.21(b)(4) did not start until that date and thus the "delinquency date" as to the Claim is November 24, 2021. We understand from your e-mail to me dated November 19, 2021 (also included in Exhibit 4), that, because of the above reasons, TSA will permit Southwest to supplement its submission in this matter on or before November 24, 2021. We appreciate TSA doing that.

The $32,031,605.39 purported liability in the Claim is based entirely on 166 supposed "error" tickets where the customer never flew, the ticket was cancelled, Southwest issued a "Residual Travel Fund" (or "RTF") to the customer for the value of the unused flights, including airfare, taxes, and Fees, and the RTF later expired unused – all in accordance with the terms of Southwest's Contract of Carriage. An RTF – which is sometimes also called a "travel credit" – is an electronic account in the customer's name and constitutes an acceptable form of payment for future ticket purchases; an RTF is essentially a virtual credit card or a gift card that may be used to purchase future travel on Southwest. *See* Estrada Decl. ¶ 9; Declaration of James A. Ruppel ("Ruppel Decl.") ¶ 7; Declaration of Ann Jaycox ("Jaycox Decl.") ¶ 4.[4] TSA asserts that, when a customer's ticket is cancelled in exchange for an RTF, Southwest was required either to refund the Fees to the customer or to remit them to TSA, but that Southwest did neither. TSA takes the position that once an RTF expires unused, it does not qualify as a refund.

TSA's position is wrong for two independent reasons. First, TSA has no authority to assess a Fee if the customer does not engage in air transportation – that is, if the customer is not a "passenger" of an "air carrier" in "air transportation." 49 U.S.C. § 44940(a)(1). In each

---

[2] The Estrada Declaration is attached hereto as Exhibit 5.

[3] The Bosworth Declaration is attached hereto as Exhibit 6.

[4] The Ruppel Declaration and Jaycox Declaration are attached hereto as Exhibits 7 and 8, respectively.

FOR OFFICIAL USE ONLY

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 3

supposed "error" ticket at issue, the customer in question did not fly, *i.e.*, did not engage in air transportation. Second, even if TSA were correct that a Fee is owed when the customer does not fly and the Fee is not refunded to the customer, no Fee was due for any of the 166 tickets at issue because Southwest provided the customer a refund in the form of an RTF. For all the alleged "error" tickets, the refund was made at the time the RTF was issued, notwithstanding its eventual expiration pursuant to Southwest's Contract of Carriage.

As you know, in 2017, U.S. Customs and Border Protection ("CBP"), on behalf of TSA, conducted a Fee audit of Southwest (the "Prior Audit") that was similar to the Audit, and that resulted in a liability assessment against Southwest for the same exact issue on which the current Claim is based. Southwest submitted a request for review of that assessment to TSA on August 9, 2018. *See* Audit Report, Appendix I at 4-20. TSA has not responded to that request for review. Southwest's position as to why the current Claim is improper is the same as was expressed in the August 9, 2018 request for review.

<b><u>Statutory, Regulatory, and Factual Background</u></b>

**A.     The Fee Statute and Fee Regulations**

In response to the terrorist attacks on September 11, 2001, Congress enacted the Aviation and Transportation Security Act, which established the TSA and charged it with maintaining civil aviation security. *See* 49 U.S.C. § 114. To cover the costs of certain security services, TSA was required to "impose a uniform fee[] on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States." 49 U.S.C. § 44940(a)(1).

"Air transportation" is defined by statute as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." 49 U.S.C. § 40102(a)(5). In turn, "foreign air transportation" is defined as "the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between a place in the United States and a place outside the United States when any part of the transportation is by aircraft," while "interstate air transportation" is defined as "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mal by aircraft" between States. 49 U.S.C. § 40102(a)(23), (25). "[I]ntrastate air transportation" is defined as "transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." *Id.* § 40102(a)(27). All of these definitions explicitly require the "transportation" of a passenger (or property or mail) by aircraft. "Air transportation" is defined in TSA's regulations to mean "continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation," all of which, in turn, are defined as "the carriage by aircraft of persons for compensation or hire" in various geographical areas. 49 C.F.R. § 1510.3.

**Miller & Chevalier Chartered**  .  900 16th Street NW  .  Black Lives Matter Plaza  .  Washington, DC 20006
T 202.626.5800  .  millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 4

The air carriers themselves, rather than TSA, must collect the Fees from passengers and then remit the Fees to TSA. 49 U.S.C. § 44940(e)(2), (3). Carriers remit Fees to TSA once a month, covering all Fees collected the preceding month. *See* 49 C.F.R. § 1510.13(a). Currently, and during the Audit Period, "Fees imposed . . . shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20." 49 U.S.C. § 44940(c)(1).

### B.    Ticket Cancellations on Southwest

When a Southwest ticket is cancelled, Southwest will either (1) credit the amount paid (including airfare, taxes, and Fees) to the customer's method of payment (typically a credit card), referred to as a "method-of-payment refund"; or (2) issue an RTF in that amount. Ruppel Decl. ¶¶ 5-7. The former is used for refundable tickets and the latter for so-called nonrefundable tickets. *Id.* ¶¶ 6-7. Southwest considers both method-of-payment refunds and RTFs to be refunds to the customer, both are reflected as "refunds" in Southwest's records, and Southwest accounts for both in similar ways. Jaycox Decl. ¶¶ 4-5; Ruppel Decl. ¶¶ 5-7.

When Southwest issues either a method-of-payment refund or an RTF, all of the accounting entries associated with the sale of the ticket are reversed. Jaycox Decl. ¶ 7. At that time, there is no airfare, taxes, or Fees and the funds at issue are no longer identified in Southwest's records as such. *Id.* ¶ 8. As part of reversing the transaction when a ticket is cancelled in exchange for either a method-of-payment refund or an RTF, Southwest removes the amount of the Fee from its TSA Fee Liability Account by classifying that amount as a "refund," which results in those funds not being paid to TSA (or being recalled from TSA if they had already been paid). *Id.* ¶ 7; *see also* Audit Report, Finding Sheet at 4.

When a customer uses an RTF to purchase a new ticket, the value of that RTF is applied to the new purchase just as if it were a cash purchase. Jaycox Decl. ¶ 9. Among other things, when an RTF is used to buy a new ticket, Southwest collects any Fees applicable to that ticket and remits them to TSA at the appropriate time.[5] *Id.* ¶¶ 6, 9; Estrada Decl. ¶ 12.

If an RTF expires unused, Southwest recognizes the entire amount of the RTF as revenue. *See* Jaycox Decl. ¶ 10; Audit Report, Finding Sheet at 4. Thus, in the end, TSA receives no Fees when a ticket is cancelled in exchange for an RTF and the RTF later expires unused. Audit Report, Finding Sheet at 4. Similarly, TSA receives no Fees when a ticket is cancelled in exchange for a method-of-payment refund or when a ticket is exchanged for an RTF and the RTF is used to purchase a ticket to which no Fee applies (*e.g.*, a ticket for a flight originating outside

---

[5] The number of Fees collected and remitted on tickets purchased with an RTF might be greater or fewer than the number of Fees originally collected on the ticket that was cancelled in exchange for the RTF. Estrada Decl. ¶ 12.

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 5

of the United States). Estrada Decl. ¶ 12.

### C.    TSA's Claim and the Audit Report

TSA's Claim is based on a review or audit that was conducted on TSA's behalf by CBP. *See* Claim at 1; Audit Report at 1. TSA stated that the Audit was authorized by 49 C.F.R. §1510.19. *See* Claim at 1. The total purported liability "determined during the review was $32,031,605.39." *Id.* In the Claim, TSA stated that it was accepting CBP's audit findings "as evidence of a liability for September 11th Security Fees due to TSA for the audit period of November 16 [sic], 2016 through March 31, 2019." *Id.* As noted above, the Claim enclosed a copy of CBP's Audit Report. The Claim and does not contain any other explanation of the purported liability.

CBP reviewed several separate areas. *E.g.*, Audit Report at 3. As to one of those areas entitled "Refunded Ticket Sample," CBP recommended a liability against Southwest in the amount of $32,031,605.39. *Id.* CBP did not find any underpayments in any other areas. *Id.* Southwest disputes the entirety of the $32,031,605.39 purported liability under the Refunded Ticket Sample portion of the Audit, and thus challenges the entirety of the $32,031,605.39 purported liability in the Claim.

In the Refunded Ticket Sample, CBP reviewed a sample of 1,000 tickets that Southwest treated as having been refunded to the customer. *Id.* at 2, 3. CBP "determined that Southwest was compliant with TSA regulations pertaining to the imposition and collection of the TSA Security Fee." *Id.* at 3.

The 1,000 tickets consist of 1,484 collected one-way trips.[6] *Id.* Of those 1,000 tickets, 683 tickets were refunded via an RTF. Estrada Decl. ¶ 11; *see also* Audit Report, Finding Sheet at 3. Of those 683 tickets that were refunded via RTF, 517 of the resulting "RTFs were used to obtain new tickets and 166 [RTFs] expired unused." Audit Report, Finding Sheet at 3. The 166 tickets associated with the 166 expired RTFs consist of a total of 249 one-way trips. *Id.*

---

[6] A one-way trip means continuous air transportation without a stopover. *See* 49 C.F.R. § 1510.3 (definition of "one-way trip"). A single itinerary for a single person might have multiple one-way trips, such as a roundtrip ticket between Dallas and Baltimore, which consists of two one-way trips (one from Dallas to Baltimore, and one from Baltimore to Dallas). The number of one-way trips matters because the $5.60 Fee applies to each one-way trip, except that total Fees for a round trip cannot exceed $11.20. *See* 49 U.S.C. § 44940(c)(1); 49 C.F.R. § 1510.5(a). The Fee applies only to passengers on flights originating at airports in the United States. *See* 49 U.S.C. § 44940(a)(1); 49 C.F.R. § 1510.5(a).

Miller & Chevalier Chartered . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 6

CBP asserts that the 166 tickets that were cancelled in exchange for RTFs that eventually expired are "error" tickets because "Southwest failed to refund or remit the collected TSA Security Fees." *Id.*; *see also id.*, Finding Sheet at 4 & Attachment A. CBP used those supposed "errors" to compute an "error rate" of 16.7790% and then applied that rate across Southwest's entire population of Fee remittances for refunded tickets during the Audit Period to extrapolate a purported Refunded Ticket Sample liability of $32,031,605.39. *Id.* at 3; *id.*, Finding Sheet at 3 & Attachment B. CBP did not consider to be "errors" any of the 517 tickets that were cancelled in exchange for RTFs that, eventually, were actually used to purchase new tickets. Estrada Decl. ¶ 11; *see also* Audit Report, Finding Sheet at 3.

As noted, each of the supposed 166 "error" tickets represent an instance where a so-called nonrefundable ticket was cancelled, where the customer never travelled, where Southwest issued a refund of the ticket price (including the Fees) to the customer in the form of an RTF, and where the RTF expired unused. Audit Report, Finding Sheet at 3-4; *id.*, Appendix II. As described by CBP:

> For each identified error, Southwest collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For each of the errors, the passengers did not use the purchased ticket and were issued an RTF by Southwest that went unused and eventually expired. Upon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA.

*Id.*, Appendix II.

CBP also stated that "[t]he determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation[,] as the use or expiration of the RTF is what creates an equitable interest in the fees." *Id.*

**D.    TSA's Theory of Liability**

As noted above, in the Claim and Audit Report, TSA and CBP take the position that if a Fee collected on a cancelled ticket is not refunded to the customer, the Fee must be remitted to TSA, even if the customer never engaged in air transportation. *E.g.*, Audit Report, Finding Sheet at 2; *id.*, Appendix II. TSA and CBP also take the position that an expired RTF does not qualify as a refund. *E.g.*, *id.*, Finding Sheet at 2-4; *id.*, Appendix II.

On the first point, CBP relies on a letter from TSA dated November 21, 2002, to the Air Transport Association (now called Airlines for America), an airline trade association. *Id.*, Finding Sheet at 2; *id.*, Appendix II. A copy of the letter is attached hereto as Exhibit 9 and is referred to herein as the "2002 Guidance Letter." The 2002 Guidance Letter addresses the

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 7

refundability of the Fee "to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel." Guidance Letter at 1. The letter states that if a ticket is cancelled and if the "ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee." *Id.* at 1. The 2002 Guidance Letter states that if a carrier remits a Fee "to TSA and then refunds the [F]ee to a ticket purchaser, the carrier may offset the refund by deducting it from the [Fees] remitted to TSA for the month in which the refund is provided." *Id.* at 2. But, the 2002 Guidance Letter asserts, if "an air carrier does not refund [the Fees] to the ticket purchaser, the [F]ees must be remitted to or remain with TSA." *Id.*

Similarly, a one page TSA "Guidance to Industry" document dated March 20, 2020, states (without any citation to authority): "If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA." A copy of that document is attached hereto as Exhibit 10 and is referred to herein as the "2020 Guidance Document."

The Audit Report (*id.*, Finding Sheet at 1-2) and the 2002 Guidance Letter cite one of the Fee Regulations, which states:

> The security service fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate.

49 C.F.R. § 1510.9(b). The 2002 Guidance Letter cites no other legal authority.

The Audit Report (*id.*, Finding Sheet at 1; *id.*, Appendix II) also cites on 49 C.F.R. § 1510.11(b) which states:

> Security service fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b).

The 2002 Guidance Letter does not explain what qualifies as a "refund" and thus does not support CBP's second point – that an expired RTF does not qualify as a refund. Instead, on that point the Audit Report (*id.*, Finding Sheet at 2) cites the 2020 Guidance Document. In turn, the 2020 Guidance Document states that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund." *Id.*; *see also* Audit Report, Finding Sheet at 2 (same). Neither the Audit Report nor the 2020 Guidance Document defines "refund" or cites any authority

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

**FOR OFFICIAL USE ONLY**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 8

for this proposition, despite Southwest's request to CBP that it provide a complete
definition of "refund" applied during the Audit. *See* Audit Report, Appendix I at 2.

**Argument**

The $32,031,605.39 of purported liability in the Refunded Ticket Sample is meritless and
should be withdrawn for two independent reasons. First, TSA has no authority to assess Fees if
the customer does not fly, *i.e.*, did not engage in air transportation. In this case, for all supposed
"error" tickets the customer did not fly. Second, even if TSA were correct that a Fee is owed
when the customer does not fly and the Fee is not refunded to the customer, no Fee is owed to
TSA for any of the 166 supposed "error" tickets because when the tickets were cancelled,
Southwest provided the customers with a full refund of all amounts paid (including any Fee
amounts) in the form of an RTF and, separately, because TSA did not give Southwest fair notice
of TSA's contrary view. Finally, and in the alternative, if this request for review is denied, TSA
should suspend the delinquency date for the supposed debt until after Southwest has had an
opportunity to obtain judicial review of TSA's decision.

**A.     The Fee Statute Does Not Allow TSA to Collect Any Amount Where the Customer
Has Not Flown**

TSA has authority to collect a Fee only if a customer actually engages in air
transportation. If a ticket is cancelled or the customer otherwise does not fly – as is the case with
each of the supposed "errors" at issue – TSA has no authority to collect any amount.

An agency cannot act contrary to a statute and "must give effect to the unambiguously
expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S.
837, 843 (1984); *see also* 5 U.S.C. § 706(2)(A) (agency action that is "not in accordance with
law" must be set aside by a reviewing court).

Nor can an agency act without authority from Congress. "Agencies are creatures of
Congress; 'an agency literally has no power to act . . . unless and until Congress confers power
upon it.'" *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (quoting *Louisiana Pub. Serv.
Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). That Congressional authority must be express and
"the absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia,
S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) ("no case of which we are aware
holds that an administrative agency has authority to fill gaps in a statute that exist because of the
absence of statutory authority"). Congress does not give an agency "plenary authority to act
within a given area simply" by giving the agency some authority to act in that area. *Ry. Labor
Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994); *see also FAG
Italia*, 291 F.3d at 817 ("The fact that [the agency] is empowered to take action in certain limited
situations does not mean that [it] enjoys such power in other instances."). Because Congress
gave TSA authority to collect funds under the Fee Statute only when the customer actually
engages in air transportation, TSA's attempt to collect what it says are Fees (or to otherwise

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 9

regulate disposition of funds governed by the private contract between Southwest and its
customers) when the customer does not fly is unlawful and must be rejected.

     **1.    The Plain Language of the Fee Statute and Fee Regulations Do Not Allow
        TSA to Collect Fees When the Ticket Is Cancelled and the Customer Never
        Flies**

As noted above, the Fee is imposed "on passengers . . . in air transportation." 49 U.S.C. §
44940(a)(1); *see also id.* § 44940(c)(1) (the Fee "shall be $5.60 per one-way trip in air
transportation"); 49 C.F.R. § 1510.1 ("fee to be paid by passengers . . . in air transportation"); *id.*
§ 1510.5 (carriers shall impose a "fee of $5.60 per one-way trip for air transportation"). As also
noted above, the Fee Regulations provide a precise definition of "air transportation": "the
carriage by aircraft of persons for compensation or hire." *Id.* § 1510.3. As also noted above, the
statute contains a similar definition of "air transportation." There is no authority for TSA to
collect any amount unless there is a "passenger" and unless that passenger has actually engaged
in "air transportation" by being "carri[ed] by aircraft." When there is no passenger or no air
transportation, TSA lacks any statutory and regulatory authority to collect or otherwise regulate
any funds.

This conclusion is separately mandated by the Fee Statute's requirement that the Fee be
used only "to pay for" certain "costs of providing civil aviation security services," such as salary,
background checks, and training for screening personnel, the cost of the air marshals program,
and the cost of training pilots and flight attendants. 49 U.S.C. § 44940(a)(1). There are no such
costs for a customer whose ticket is cancelled and never boards a plane.

Likewise, the Fee must be "reasonably related to [TSA's] costs of providing services
rendered." *Id.* § 44940(b). Again, if the customer did not engage in air transportation, no
services were rendered by TSA to that customer. Consequently, any Fee would be unreasonable
and unauthorized by the Fee Statute for this additional reason.

Given the plain language of the Fee Statute, it is not surprising that both TSA and the
U.S. Court of Appeals for the District of Columbia Circuit have concluded that "no [F]ees had
*ever* been incurred" where the customer had "never used the purchased ticket." *Alaska Airlines,
Inc. v. TSA*, 588 F.3d 1116, 1122-23 (D.C. Cir. 2009) (emphasis added); *accord* Brief of the
Respondent at 38, *Alaska Airlines, Inc. v. TSA*, No. 09-1062 (D.C. Cir. Aug. 24, 2009) (attached
hereto as Exhibit 11) ("no fees have ultimately been incurred" where the passenger "did not
follow through with travel plans, never used the purchased ticket, and thus did not ultimately
incur a fee liability").

Because TSA has no authority to collect a Fee if there is no actual passenger who travels
on a plane, none of the supposed "errors" in the Audit can serve as the basis of any Fee liability.

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

**FOR OFFICIAL USE ONLY**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 10

        **2.**    **Nothing in § 1510.9(b) of the Fee Regulations Obligates a Carrier to Pay Any Amount to TSA When Customers Do Not Fly and, If Read As Proposed in the 2002 Guidance Letter, the 2020 Guidance Document, and the Audit Report, the Regulation Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute**

As noted above, in both the 2002 Guidance Letter and the Audit Report, TSA and CBP rely on 49 C.F.R. § 1510.9(b), which, again, states: "The security service fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate." That regulation cannot support the conclusion in the 2002 Guidance Letter, the 2020 Guidance Document, or the Audit Report. First, even assuming for the moment that this regulation requires a carrier to refund to the customer Fees on cancelled tickets (and it does not), nothing in that regulation states that a carrier must pay anything to TSA if the carrier violates that obligation. That is, even if Southwest hypothetically were to violate this provision by failing to give the customer what TSA believes to be a satisfactory refund, TSA has no authority to seize from Southwest the amounts that TSA claims should have been refunded to the customer. The Fee Regulations have a provision entitled "Enforcement," but that provision does not authorize TSA to collect any amounts other than Fees properly owed under the Fee Statute and Fee Regulations, which is not the case here. *See* 49 C.F.R. § 1510.21.

Second, and more importantly, even if 49 C.F.R. § 1510.9(b) were read (incorrectly) as suggested by the 2002 Guidance Letter, the 2020 Guidance Letter, and the Audit Report, the regulation would be invalid because it would conflict with, and exceed the authority granted by, the Fee Statute which, as established above, authorizes TSA to receive funds only when a passenger flies, *i.e.*, engages in air transportation.

Relatedly, neither the 2002 Guidance Letter nor the 2020 Guidance Document is binding on anyone for any purpose. Indeed, the U.S. Department of Justice would not rely on them in pursuing enforcement actions. *See* U.S. Department of Justice, Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018) (attached as Exhibit 12); *see also* 84 Fed. Reg. 1820-01 (Feb. 5, 2019) ("As required by the Administrative Procedure Act, the Department does not use guidance documents as a substitute for rulemaking and does not use guidance documents to impose new requirements on entities outside the Executive Branch."). And, the 2020 Guidance Document was not even issued until almost a year after the end of the Audit Period and more than three years after the Audit Period started. Neither the 2002 Guidance Letter nor the 2020 Guidance Document is the law. In contrast, the law – that is, the Fee Statute and Fee Regulations – imposes no duty on carriers either to refund Fees to customers when tickets are cancelled or to remit those amounts to TSA.

In fact, Congress plainly knows how to craft a statute requiring a carrier to give the customer a refund. Congress did exactly that, for example, with respect to the federal excise tax

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 11

on air transportation found at 26 U.S.C. § 4261. *See id.* § 6415(a) (providing that a carrier that collected the tax from a customer can obtain a refund of that tax if the carrier "has repaid the amount of such tax to the person from whom [the carrier] collected it, or obtains the consent of such person to the allowance of such credit or refund"). The Fee Statute contains no such provision, however, even though Congress was well aware of the § 4261 excise tax when drafting the Fee Statute, as evidenced by the fact that the Fee Statute explicitly mentions the § 4261 tax. *See* 49 U.S.C. § 44940(e)(5). Moreover, the Fee Statute does contain a provision allowing for refunds by TSA of "any fee paid by mistake or any amount paid in excess of that required." *Id.* § 44940(g). But that section – like the rest of the Fee Statute – contains no requirement that a carrier refund any amounts to the customer.

> 3. **If Read As Proposed in the Audit Report, § 1510.11(b) of the Fee Regulations Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute. And in Any Event, an RTF Is Not a "Fee"**

As noted above, TSA and CBP also rely on 49 C.F.R. § 1510.11(b). Again, 49 C.F.R. § 1510.11(b) states that Fees collected by a carrier "are held in trust" by the "carrier for the beneficial interest of the United States" and that the "carrier holds neither legal nor equitable interest in the" Fees (except for the right to keep the interest thereon). 49 C.F.R. § 1510.11(b). According to the Audit Report, "[u]pon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA." Audit Report, Appendix II. This argument fails as both a legal and a factual matter.

On the law, § 1510.11(b) simply cannot override, or exceed the authority granted to TSA by, the Fee Statute. Again, the Fee Statute permits TSA to obtain funds only when the customer actually engages in air transportation. Once the customer's ticket is cancelled and the customer no longer has any right to engage in air transportation, there cannot be any "Fee" and TSA cannot be entitled to any funds. *See, e.g., Alaska Airlines*, 588 F.3d at 1122-23.

As with other similar provisions in the law, the clear intent of § 1510.11(b) is to protect the United States' interests in taxes or fees between the time they are collected by the statutory collector (here, air carriers) and the time they are remitted by the collector to the government. In particular, the fact that the collector holds the funds in trust and does not have an equitable interest in them shields those funds from the collector's creditors in the event of a bankruptcy or other insolvency. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (taxes collected by the debtor and held in trust for the United States are not part of the bankruptcy estate). But the purpose of § 1510.11(b) is *not* to define what is a Fee and what is not a Fee. It merely states that *if* an amount is a Fee, then it is held in trust for the United States and the carrier has no equitable interest. Because no Fee is possibly owed once a ticket is cancelled and the customer has no right to air transportation, § 1510.11(b) has no application here.

CBP's argument also fails as a factual matter. Even if a Fee theoretically could exist in

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 12

connection with a cancelled ticket (and it cannot), under the facts of this case there is no longer any Fee associated with any of the 166 supposed "errors" once the ticket was cancelled and the value that once made up the ticket price is issued to the customer as an RTF. The Audit Report erroneously assumes that the amounts originally collected as Fees continue to be properly characterized as Fees even after the ticket is cancelled and the funds are issued as an RTF. *See* Audit Report, Appendix II. That is wrong. As noted above, once the ticket is cancelled, all of the components of the purchase price – the airfare, taxes, and Fees – cease to exist. *See* Jaycox Decl. ¶¶ 7-8; Ruppel Decl. ¶ 9. Instead, at the time the ticket is cancelled, those transactions are reversed and all that remains is a single, non-denominated liability to the customer in the form of the RTF. *Id.* If and when the RTF later expires and Southwest takes the funds at issue as revenue, Southwest takes an interest not in Fees but rather in a cash-equivalent asset that, until that time, belonged solely to the customer. Thus, Southwest never takes any interest in any Fees. The Fees ceased to exist once the ticket was cancelled. Moreover, the customer expressly agrees to this process in Southwest's Contract or Carriage.

Under TSA's theory, the trust purportedly created by 49 C.F.R. § 1510.11(b) continued to attach to the funds at issue even though they were converted into an aggregate RTF and even though no ticket for a flight to which the Fee applied existed anymore. According to the Audit Report, "[t]he determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation[.] as the use or expiration of the RTF is what creates an equitable interest in the fees." Audit Report, Appendix II. That is wrong. There is a completed transaction at the time the ticket is cancelled. It is incorrect for CBP to say that, at that time, it is impossible to know whether a refund has in fact been given. The customer receives value in the form of the RTF as soon as it is issued. Whether and how the customer eventually choses to spend that RTF has no bearing on whether the customer received something of value at the time the RTF was issued.

These reasons demonstrate the absurdity and impropriety of TSA assessing a Fee liability when the customer has not flown, which is precisely what the Audit Report and the Claim seek to do in assessing the $32,031,605.39 of purported liability associated with the Refunded Ticket Sample.

**B.      When Issued, RTFs Are Refunds to Customers**

The second fundamental flaw in the Claim and Audit Report is its failure to recognize that an RTF qualifies as a "refund" as soon as it is issued. Nothing in the Fee Statute, the Fee Regulations, the 2002 Guidance Letter, or the current Claim defines what qualifies as a "refund" or remotely suggests that refunds cannot be given in the form of an RTF or other forms of credit. While the 2020 Guidance Document states that "providing credit towards future services, with or without an expiration, does not constitute a refund," it cites no authority for that proposition. In fact, the 2020 Guidance Document's unsupported declaration is not the law, and was issued after the Audit Period ended. It thus cannot possibly impact Southwest's liability in this case. Meanwhile, seemingly in conflict with the 2020 Guidance Document and its position on this

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 13

point, TSA and CBP concede that RTFs that are issued and subsequently used by the customers *do* qualify as refunds, while in the same breath, they incorrectly contend that an expired, unused RTF does not qualify as a refund. TSA and CBP have not, and cannot, reconcile these opposing positions.

As stated above, the accounting treatment of a cancelled ticket is exactly the same regardless of whether the customer receives a form-of-payment refund or an RTF. The entire ticket transaction is reversed and, in either event, the full value of the ticket (including airfare, taxes, and Fees) is returned to the customer. The fact that such value is returned to the customer in the form of an RTF does not change that.

Moreover, a multitude of sources consider RTFs (whether eventually used or not) to be refunds. That is certainly how Southwest and its employees view RTFs. *See* Ruppel Decl. ¶¶ 5-7, 9-11; Jaycox Decl. ¶¶ 4, 11. Estrada Decl. ¶¶ 9-11. As Southwest's Vice President of Customer Relations and Rapid Rewards puts it: "At Southwest, as soon as an RTF is issued and regardless of whether it is eventually used, we consider the RTF to be a refund in every sense of the word." Ruppel Decl. ¶ 9; *see also* Jaycox Decl. ¶ 11 ("From an accounting – and in every other – perspective, RTFs are refunds to customers. That is true immediately upon the issuance of the RTFs and is true regardless of whether the RTFs are eventually used by the customers.").

Likewise, the agreement between Southwest and its customers (*i.e.*, the Contract of Carriage) makes clear that RTFs are in fact "refunds." For starters, the Contract of Carriage provisions describing RTFs are found in Section 4.c.(3), with that section coming under a heading (at Section 4.c.) called "Refunds." Moreover, Section 4.c.(3) states: "The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, *except as provided in this Section* and Section 9b." Contract of Carriage § 4.c.(3)(i) (emphasis added). Thus, the Contract of Carriage establishes that "refunds" do occur even for so-called nonrefundable tickets, but only as provided in the cited sections of the Contract of Carriage. That same Section 4.c.(3) then goes to explain the form of the refund: "Travel Credit. Unless otherwise stated by the Carrier, the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of future travel on Carrier for the originally ticketed Passenger only."[7] *Id.* § 4.c.(3)(ii). Notably, "security fees" are included in this very same refund mechanism. Separately, the Contract of Carriage explains that "[s]hould a Passenger fail to apply the . . . travel credit toward the purchase of future travel within the eligibility period,[8] the entire amount of the fare, including

---

[7] The Contract of Carriage uses the phrase "travel credit." As noted above, that is synonymous with RTF. *See* Ruppel Decl. ¶ 7; Jaycox Decl. ¶ 4; Estrada Decl. ¶ 9.

[8] The eligibility period is one year from the date of the original ticket issuance that is refunded in the form of the travel credit. Estrada Decl. ¶ 9; Audit Report, Finding Sheet at 4.

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 14

all taxes, security fees, and Passenger Facility Charges, will be forfeited." *Id.* § 4.c.(3)(iv).[9]
Thus, once the fare is refunded to an RTF, the subsequent treatment and disposition of those
aggregate funds is a matter of private contract between Southwest and the customer, and not
within the scope of TSA's authority.

Given that the Contract of Carriage considers RTFs to be refunds, it is not surprising that
Southwest creates, stores, and modifies RTFs in its "Refund System" which is called
"RefundPro." Ruppel Decl. ¶ 10; Audit Report, Finding Sheet at 2-3 n.4. And, in the records
stored in that that system, RTFs are specifically referred to as "refunds." Ruppel Decl. ¶ 10 &
Exhibit A.

Further, when Southwest communicates with a customer whose ticket has been cancelled
in exchange for an RTF, Southwest specifically refers to a "REFUND" occurring on the date the
ticket was cancelled and the RTF was issued.[10]  Ruppel Decl. ¶ 11 & Exhibit B.

Even the CBP auditor from the Prior Audit referred to RTFs as "refunds" (before coming
up with the contrary position). After Southwest made known to the auditor that it thought the
assessment of Fees was prohibited by the Fee Statute and, in any event, that RTFs are refunds,
the CBP auditor (Ashley Kervin) sent an e-mail dated July 11, 2017, seeking guidance from Ms.
McMenamin, the Compliance Manager for TSA's Office of Revenue.  A copy of that e-mail
(and Ms. McMenamin's response) is attached hereto as Exhibit 14.  In that e-mail, Ms. Kervin

---

[9] The above-cited provisions of Southwest's Contract of Carriage did not change during the
Audit Period or the period covered by Prior Audit, and are still in effect today. Those provisions
are attached as exhibits to the Declaration of Maren Matal (which is attached hereto as Exhibit
13). All citations herein to the Contract of Carriage refer to all versions attached to that
declaration. The entirety of Southwest's current Contract of Carriage can be found at:
https://www.southwest.com/assets/pdfs/corporate-commitments/contract-of-carriage.pdf. If you
would like any additional versions of the Contract of Carriage, please let me know and I will
provide them.

[10] Beyond Southwest, others too consider RTFs to be refunds. Customers refer to RTFs as
refunds when they contact Southwest's Customer Relations department to offer compliments
regarding Southwest's advantageous refund policies. Ruppel Dec. ¶ 12. And, during the Audit
Period, Forbes ran an article about Southwest's favorable "refund policies" that also refers to
RTFs as refunds. *Id.* ¶ 13. The Forbes article has a section entitled "Refund Policy Overview"
that explains that "the price of non-refundable tickets is applied to future travel within one year
of the purchase date." *Id.*, Exhibit C at 2-3. The article continues: "Since Southwest offers a
*free* ticket change policy [*i.e.*, the customer can cancel the ticket and use the resulting RTF to
buy a new ticket], *you are getting a full refund* of the price you paid for your ticket to apply
towards your next trip." *Id.*, Exhibit C at 3 (first emphasis in original; second emphasis added).

Miller & Chevalier Chartered . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 15

"first explain[s] Southwest's policy and then Southwest's position." Exhibit 14 at 2. In the
paragraph describing Southwest's policy Ms. Kervin wrote:

> Southwest allows customers who purchase a nonrefundable airfare ticket and later
> discover they cannot travel as booked to retain all funds for future use to purchase
> another ticket to fly on Southwest. The total amount paid for the cancelled ticket
> (base fare plus all passenger taxes and fees associated with the itinerary) *is
> refunded to the customer in the form of a residual travel fund (RTF).* Southwest
> then accepts the RTF's as an acceptable use of payment for the customer to use in
> booking a future trip. The customer has one year to use any available RTF and
> upon expiration of the RTF, Southwest books the entire amount to revenue.

*Id.* (emphasis added). The CBP auditor had it exactly right in this e-mail.

Thus, Southwest, its employees, its policies, its systems, its customers, the press, and
even the CBP auditor from the Prior Audit all consider RTFs to be "refunds." Meanwhile,
neither TSA nor CBP has identified any authority suggesting they are not.

Case law also supports the conclusion that RTFs are "refunds." Disputes about what
qualifies as a refund of airline ticket taxes have occurred in connection with the federal excise
tax on air transportation found at 26 U.S.C. § 4261. That is because, as noted above, the law
allows a carrier to seek a refund of such tax only in limited circumstances, including when the
carrier "has repaid the amount of such tax to the person from whom he collected it." *Id.*
§ 6415(a). *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997), involved a
dispute about whether "United refunded the full amount of the tax it had collected from the
customer" so as to comply with § 6415(a). *Id.* at 552. In that case, customers had cancelled their
tickets and were subject to penalties from the airline for doing so. For some types of tickets, the
cancellation fees were less than 100% of the amount paid for the ticket. But if the ticket was for
travel from the continental United States to Hawaii, the penalty was 100% of the amount paid for
the ticket, including taxes and fees. The penalties were automatically deducted from the refunds
given to the customers. Thus, customers subject to the 100% penalty received no money back at
all after they cancelled their tickets. Nonetheless, the court held that refunds within the meaning
of 26 U.S.C. § 6415(a) were given because the refund and the imposition of the penalty were two
separate transactions.

Similarly, the issuance of the RTF when the ticket is cancelled and the potential eventual
expiration of the RTF are two separate transactions. *See* Jaycox Decl. ¶ 10. If anything, the
logic in *United Airlines* applies here with even more force for two reasons. First, Southwest's
issuance of a refund to the customer in the form of an RTF and the expiration thereof are
separated in time (unlike the refund and simultaneous penalty in the *United Airlines* case).
Second, Southwest's customers actually have the ability to use the RTFs for new tickets. Most
Southwest customers do exactly that, as evidenced by, among other things, the fact that of the

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

FOR OFFICIAL USE ONLY

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 16

683 RTFs in the Refunded Ticket Sample, 517 – more than 75% – "were used to obtain new tickets." Audit Report, Finding Sheet at 3.

Further, the IRS has repeatedly stated that credits of various sorts qualify as "refunds." *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 ("This holding is equally applicable to a situation in which a carrier allows the passenger a refund by credit rather than by cash."); Rev. Proc. 2011-17, 2011-1 C.B. 441 (in connection with a customer returning merchandise, allowing the store to treat the issuance of a gift card to the customer as the equivalent as a cash refund).

Tellingly, as noted above, CBP admits that if the customer is issued an RTF and uses that RTF to purchase another ticket, then a refund has been given. As also noted above, there were 517 tickets fitting that description in the Refunded Ticket Sample and CBP agrees that none of those should be counted as "errors." *See* Audit Report, Finding Sheet at 3. To escape this admission, CBP contends that whether an RTF qualifies as a refund cannot be determined until the customer either uses the RTF to purchase another ticket or the RTF expires unused. *See id.*, Appendix II. In other words, under CBP's view, it is impossible to determine whether a refund has been given until long after a ticket has been cancelled and an RTF has been issued. This illogical result demonstrates a fundamental flaw in that position. Namely, there are two separate transactions, just as there were in the *United Airlines* case: (1) the issuance of the RTF (which is a refund), and (2) the potential expiration and resulting forfeiture of the RTF pursuant to the terms of Southwest's Contract of Carriage. The latter does not and cannot negate the impact of the former. Because an RTF is a refund to the customer as soon as it is issued, the entire $32,031,605.39 of purported liability in the Refunded Ticket Sample – which is predicated on, among other things, Southwest's alleged failure to have provided adequate refunds – is improper for this second, independent reason.

## C.    TSA Did Not Give Southwest Fair Notice of TSA's Contrary Interpretation of the Term "Refund"

Separately, assuming without agreeing that an RTF that later expires unused does not qualify as a refund, no liability should be imposed in this case because TSA did not give Southwest fair notice of its interpretation of "refund." *See, e.g., Univ. Med. Ctr., Inc. v. Sebelius*, 856 F. Supp. 2d 66 (D.D.C. 2012). Agencies cannot enforce regulations that do not "give an adequate warning of what they command or forbid." *Diebold, Inc., v. Marshall*, 585 F.2d 1327, 1334-35 (6th Cir. 1978). Unless "a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform," the regulated party cannot be held liable. *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

Here, the period at issue is November 1, 2016, through March 31, 2019. Yet, before the Prior Audit of Southwest's Fee compliance, TSA had never given Southwest any notice of

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 17

TSA's position that expired RTFs do not qualify as refunds. Estrada Decl. ¶ 13. That Prior Audit occurred in 2017 and the resulting audit report (dated December 19, 2017) was not transmitted to Southwest until July 12, 2018, which is well into the current Audit Period. *See* Exs. 15 and 16. And, as you know, on August 9, 2018, Southwest submitted a request for review of the assessment resulting from the Prior Audit. *See* Audit Report, Appendix I at 4-20. Among other things, Southwest disputed TSA's interpretation that expired RTFs do not qualify as refunds. *Id.*, Appendix I at 5, 15-18. As you also know, TSA has not responded to Southwest's August 9, 2018, request for review. Meanwhile, the unsupported 2020 Guidance Document on which the current Audit Report relies was not issued until after the end of the Audit Period.

Aside from the Prior Audit and the 2020 Guidance Document, the only guidance TSA could reasonably have been said to have given Southwest on the subject of "refunds" is the 2002 Guidance Letter, which offers no definition or explanation of what is meant by the term and focuses on situations "where the tickets are nonrefundable *and have no value toward future travel*." *See* 2002 Guidance Letter at 1 (emphasis added). Here, of course, RTFs can be used for future travel.

Lack of notice in this case is particularly meaningful in light of *United Airlines'* established contrary precedent as to the meaning of "refund." Further, TSA has not ever raised this issue in its Fee audits of Southwest before the Prior Audit, even though Southwest has been handling cancelled tickets and RTFs the same way for many years. Estrada Decl. ¶ 13. Further still, we understand that various other airlines have been handling these situations in the same way Southwest does and that for many years TSA similarly took no action.

Because TSA did not give Southwest fair notice of its interpretation of "refund," it cannot hold Southwest liable in this matter, even if TSA is correct (which it is not) that RTFs that expire do not qualify as refunds.

**D.    In the Alternative, If TSA Denies This Request for Review, TSA Should Suspend Accrual of the Time to Delinquency While Southwest Obtains Judicial Review of TSA's Decision.**

Department of Transportation regulations permit a party to request that TSA suspend the accrual of time to delinquency for any claim that is under review. 49 C.F.R. § 89.21(f)(1). TSA may also accept a written agreement to pay the claim proposed by the party disputing the debt. *Id.* § 89.21(g). Because Southwest intends to seek judicial review of any adverse administrative decision in this matter, it preemptively requests that, if TSA denies its request for review, TSA suspend the accrual of time to delinquency for the Claim until the judicial review process is complete.

Suspension of the accrual of time to delinquency is not only within TSA's authority, but it is also appropriate here because Southwest will be irreparably harmed if the alleged debt is deemed delinquent before the judicial review process is complete. If TSA refuses to suspend the

**Miller & Chevalier Chartered** . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

**FOR OFFICIAL USE ONLY**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 18

accrual of time to delinquency, Southwest will be harmed in a manner that will be irreparable.
Without an agreement from TSA allowing Southwest to pay the claim after the judicial review
process, Southwest will be forced to pay the claim shortly after any adverse decision on this
request for review. *See* 49 C.F.R. § 89.21(f)(2) (if a claim is found valid, accrual of interest and
time to delinquency shall commence 15 days after the agency mails the notification of decision).
Unless TSA agrees to pay interest on the claim during the period in which the case is in the
judicial review process, Southwest will not receive any interest on the amount paid to satisfy the
Claim. *See United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659 (1947) ("[I]nterest can
be recovered against the United States only if express consent to such recovery has been given
by Congress. And Congress has indicated . . . that its consent can take only two forms: (1) a
specific provision for the payment of interest in a statute; (2) an express stipulation for the
payment of interest in a contract duly entered into by agents of the United States."). Southwest
will therefore never be made whole if it is forced to pay the Claim prior to completion of the
judicial review process and it succeeds in that process. That is, it will forever have lost the time
value of the money paid to TSA beginning shortly after an adverse decision on Southwest's
request for review until the time TSA returns that money after judicial review, if successful.

However, TSA will be no worse off if it agrees to suspend the accrual of time to
delinquency until after the judicial review process because Southwest will agree to pay interest
on the Claim from 15 days after TSA mails the notification of any adverse decision on
Southwest's request for review until the time when the Claim is fully paid by Southwest
following any adverse final ruling from the judicial review process. This is consistent with how
interest typically works in federal court: Under Federal Rule of Appellate Procedure 37, if a
money judgment in a civil case is affirmed, the applicable interest is payable from the date when
the district court's judgment was entered. *See* Fed. R. App. P. 37(a).

For these reasons, if TSA denies Southwest's request for review, we ask that TSA use its
authority to suspend the accrual of time toward delinquency and agree that the Claim will not
become delinquent until after a final judgment in the judicial review process. Doing so would
properly balance the equities so that either side would be fully compensated after that process is
complete.

## Conclusion

Because the Fee Statute and Fee Regulations allow TSA to obtain a Fee only when a
passenger engages in air transportation and, separately, because an RTF – whether eventually
used or not – is a refund at the moment it is issued, Southwest cannot be liable as TSA asserts in
the Claim and the Audit Report. Southwest thus respectfully requests that TSA withdraw the
$32,031,605.39 purported liability in the Claim. In the Alternative, if Southwest's request for
review is denied, TSA should suspend accrual of the time to delinquency for the Claim while
Southwest pursues judicial review.

Miller & Chevalier Chartered . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

**FOR OFFICIAL USE ONLY**

Pamela McMenamin, Compliance Manager
Transportation Security Administration
November 23, 2021
Page 19

Sincerely,

Adam P. Feinberg
*Counsel for Southwest Airlines Co.*

Enclosures

Miller & Chevalier Chartered . 900 16th Street NW . Black Lives Matter Plaza . Washington, DC 20006
T 202.626.5800 . millerchevalier.com

FOR OFFICIAL USE ONLY

## SOUTHWEST AIRLINES
## AUDITOR'S REJOINDER

***Company Comment:*** TSA has no authority to assess Fees if the customer does not fly and Southwest provided the customer with a refund in the form of an RTF.

***Auditor's Rejoinder:*** TSA Security Fees are to be collected by the air carrier when a ticket for future air transportation is sold.

For each identified underpayment error, Southwest collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For each of the errors, the passenger did not use the purchased ticket and was issued an RTF by Southwest that went unused and eventually expired. Upon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA.

TSA issued guidance to air carriers for instances when the customer does not use a ticket that was purchased for air transportation which states "when a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser. If such a ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee…in any case where the air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted or remain with TSA." Southwest argues that issuance of an RTF, regardless of whether it eventually expires, is a refund. However, Title 49 CFR 1510.11(b) states that the direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to 1510.13(b). By retaining the fees collected on behalf of TSA and recognizing those fees as revenue, Southwest has created an equitable interest in the principal amounts. The determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation as the use or expiration of the RTF is what creates an equitable interest in the fees.

**FOR OFFICIAL USE ONLY**

# TSA 2002 Guidance Letter
# TSA-2001-11120-0059



*United States Department of Transportation*
TRANSPORTATION SECURITY ADMINISTRATION

400 Seventh Street, S.W.
Washington D.C. 20590

NOV 2 1 2002

Mr. James A Hultquist
Managing Director, Taxes
Air Transport Association
1301 Pennsylvania Ave., N.W., Suite 1100
Washington, DC 20004-1707

Docket No. 11120

$$TSA \cdot 02 \cdot 1120 - 59$$

Dear **Mr.** Hultquist:

Thank you for your letter of October 9, 2002, on behalf of the members of the Air Transport Association (ATA) requesting guidance on the refundability of the Transportation Security Administration's (TSA) September 11th Security Fee to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel. In addition, you inquire as to whether carriers or TSA should provide refunds of September 11th Security Fees to ticket purchasers, as it is common for carriers to have already remitted to TSA the actual fees collected from ticket purchasers. You note that ATA is also seeking guidance from the U.S. Department of Agriculture, the Immigration and Naturalization Service, and the Customs Service on their passenger fee refund requirements. Finally, you refer to Revenue Ruling 89-109, in which the Internal Revenue Service held that, to the extent that airlines do not refund the cost of airline tickets to passengers, the attributable taxes are due to be remitted to the Government.

On October 10, TSA placed a copy of your letter in the Department of Transportation's Docket Management System (DMS) for public review. The DMS is accessible online at http://dms.dot.gov and your letter is identified as item 57 in Docket No. TSA-2001-11120. TSA also placed a copy of this response in that docket.

Under 49 CFR **Part** 1510, air carriers and foreign air carriers are required to collect September 11th Security Fees, hold them in trust for TSA, and remit them to TSA by the end of the month following the calendar month in which the transportation was sold. These carriers are responsible for the safekeeping and accounting of these fees. While Part 1510 does not address in detail how refunds are to be handled, it clearly indicates that air carriers and foreign air carriers are responsible for refunding September 11th Security Fees to ticket purchasers. Specifically, it provides that "[a]ny changes by the passenger to the itinerary that alter the number of enplanements <u>are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier</u> as appropriate." 49 CFR § 1510.9(b) (emphasis added). When a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser. If such a ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee.

TSA is considering promulgating further details concerning refunding September 11th Security Fees, as will be reflected in the Final Rule for 49 CFR Part 1510. In any case where an air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted to or remain with TSA.

Where a carrier remits a September 11th Security Fee to **TSA** and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the September 11th Security Fees remitted to TSA for the month in which the refund is provided. In such circumstances, the carrier must keep auditable records of the refund, as required by 49 CFR 1510.15. The carrier must also accurately denote the refund in its quarterly report of September 11'' Security Fees imposed, collected, refunded and remitted, as required by 49 CFR 1510.17, as amended.

If you need further assistance, please contact me at (202) 385-1209. You may also contact Steven Cohen in the Office of the Chief Counsel at (202) 493-1216.

Sincerely,

*Randall S. Fiertz*

Randall Fiertz
Acting Director of Revenue

ATA  Inquiry Letter
TSA-2001-11120-0057

196465



DEPT. OF TRANSPORTATION
DOCKETS

02 OCT 10  PM 3:2 a

## AIR TRANSPORT ASSOCIATION

**JAMES A. HULTQUIST**
*Managing Director, Taxes*

October 9, 2002

Randall Fiertz
Acting Director of Revenue
Transportation Security Administration
Department of Transportation
400 Seventh St. SW.
Washington, DC 20590     TSH - 2001 - 11120 - 57

Re: Application of Passenger Civil Aviation Security Service Fees

Dear Mr. Fiertz:

This letter is on behalf of the member airlines of the Air Transport Association of America
(ATA). The ATA is the United States' oldest and largest airline trade association. Our members
include 22 U.S. and five associate (non-U.S.) airlines.[1] U.S members account for more than 95
percent of the passenger and cargo traffic carried by scheduled U.S. airlines.

Recently, several ATA members received inquiries regarding the refundability of various
governmentally imposed fees paid by passengers who do not travel on their scheduled flights (not
including changes due to weather, mechanical problems, etc.). Under the rules applicable to
certain tickets, if a passenger does not travel as scheduled, the tickets for the unused travel will
expire and the amount paid for the unused travel will not be refunded and will have no value
toward future travel. Depending upon the ticket, the timing of this expiration may be as early as
the originally scheduled date of transportation or as much as 12 months after that date.

The airlines are seeking guidance as to the proper treatment of the Passenger Security Service
Fee administered by the TSA when tickets expire.[2] Airlines are required to collect this fee from

---

[1] The members are Airborne Express, Alaska Airlines, Aloha Airlines, America West Airlines, American Airlines,
American Trans Air, Atlas Air, Continental Airlines, Delta Air Lines, DHL Airways, Emery Worldwide Airlines,
Evergreen International Airlines, FedEx, Hawaiian Airlines, JetBlue Airways, Midwest Express Airlines, Northwest
Airlines, Polar Air Cargo, Southwest Airlines, United Airlines, UPS Airlines, and US Airways. Associate members
are Aeromexico, Air Canada, Air Jamaica, KLM Royal Dutch Airlines, and Mexicana

[2] Similar guidance is also being requested from the Agriculture Department, Immigration and Naturalization Service,
Customs Service and Department of Transportation, all of which either impose or administer fees on certain
passengers.

Randall Fiertz
October 9, 2002
Page 2

certain passengers at the time a ticket is sold and they remit the fees within a prescribed time period to the agency.  If a passenger's ticket expires, and the passenger is not entitled to a refund of the fare from the airline, is the previously collected the Passenger Security Service Fee applicable to the unused travel refundable to the passenger?  If so, from whom does the passenger request the refund, since in many cases the airline has already remitted the funds collected, and it would not otherwise be issuing a refund to the passenger?

The Internal Revenue Service previously considered an analogous situation.  In Revenue Ruling 89-109, the IRS held that "to the extent the airline does not refund to the passenger the amount paid for the air transportation, the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government

Because of multiple inquiries to ATA members concerning such fees, we would appreciate receiving the requested guidance as soon as possible.  If you have any questions or need additional information, I can be reached at 202-626-4213.

Sincerely,

James A. Hultquist
Managing Director, Taxes

CC: Steven Cohen, Transportation Security Administration

TSA 2020 Guidance Letter
TSA-2001-11120-0680



**U.S. Department of Homeland Security**
**Arlington, Virginia 20598-6014**

Transportation
Security
Administration

March 20, 2020

## GUIDANCE TO INDUSTRY

The Transportation Security Administration (TSA) understands that COVID-19 (Coronavirus) has had great impact on travelers, the general public, and the air carrier industry.  During this unprecedented event, air carriers may be facing an extreme economic situation where monthly TSA September 11th Security Fee (Passenger Fee)[1] refunds to passengers may be greater than the monthly Passenger Fees imposed and collected by your company.

To uniformly address recent inquiries on this matter and consistent with the guidance TSA issued to industry on November 21, 2002 regarding Passenger Fee[2] refunds, this guidance letter is issued to provide uniform clarification to industry during this unparalleled event.

TSA allows air carriers to offset Passenger Fee refunds to passengers by deducting the refunds from current Passenger Fee liabilities due and owing to TSA for a given month. In cases where monthly Passenger Fee refunds to passengers are greater than monthly liabilities, an air carrier may continue to offset from a future Passenger Fee liability or request a return of the Passenger Fees remitted to TSA. If requesting a return of Passenger Fees previously remitted to TSA, an air carrier must provide documentation supported by your accounting system demonstrating the calculation of the request. Air carriers must also retain auditable records related to such a request per 49 CFR Part 1510.15-19.

When requested by a passenger, TSA considers a passenger fee refund a return of payment preferably in the form of original payment. Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund.

***If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA.  All fees for the period of February 2020 continue to be due to TSA no later than March 31, 2020 and each month thereafter.***

TSA appreciates the continued cooperation of or air carrier partners during the extraordinary operating environment.  We continue to welcome any further comments and concerns from our customer air carriers and their associations. If you have any questions in these matters, please contact the TSA Office of Revenue at (571) 227-2323 or tsa-fees@dhs.gov.

---

[1] 49 CFR Part 1510.

[2] See original guidance at https://www.regulations.gov/document?D=TSA-2001-11120-0059.